Robson BONNICHSEN, C. Loring Brace, George W. Gill, C. Vance Haynes, Richard L. Jantz, Douglas W. Owsley, Dennis J. Stanford, and D. Gentry Steele, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT OF THE ARMY, U.S. Army Corps of Engineers, Bartholomew B. Bohn II, Donald R. Curtis, and Lee Turner, Defendants.

ASATRU FOLK ASSEMBLY, Stephen A. McNallen, William Fox, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT OF THE ARMY, U.S. Army Corps of Engineers, Ernest J. Harrell, Donald R. Curtis, and Lee Turner, Defendants.

Civil Nos. 96–1481–JE, 96–1516–JE.

United States District Court,
D. Oregon.

June 27, 1997.

Alan L. Schneider, Portland, OR, Paula A. Barran, Dian S. Rubanoff, Lane, Powell, Spears & Lubersky, Portland, OR, for Plaintiffs in No. 96–1481.

Michael T. Clinton, Portland, OR, for Plaintiffs in No. 96–1516.

Lois J. Schiffer, Assistant Attorney General, Daria J. Zane, U.S. Department of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, Kristine Olson, U.S. Attorney District of Oregon, Tim Simmons, Assistant U.S. Attorney, Portland, OR, for Defendants.

David J. Cummings, Douglas Nash, Nez Perce Tribal Executive Committee, Office of Legal Counsel, Lapwai, ID, for *Amicus Curiae* Nez Perce Tribe and Confederated Tribes of the Umatilla Indian Reservation.

JELDERKS, United States Magistrate Judge:

The focal point for this controversy is a set of human remains, believed to be over 9000 years old, that were discovered in 1996 near Kennewick, Washington, along the bank of the Columbia River.[1] The facts and procedural history of this case are detailed at length in a prior opinion filed on February 19, 1997. Following oral argument on June 2, 1997, I issued several rulings from the bench. The present opinion is intended to supplement and amplify those bench rulings, and to provide additional guidance to the defendants so that this controversy may be resolved in a timely and orderly manner.

**The Parties**

The *Bonnichsen* plaintiffs are scientists who contend the discovery is of great historical and anthropological significance and want to study the remains. Defendant Army Corps of Engineers concluded that the remains were subject to the Native American Graves Protection and Repatriation Act ("NAGPRA"), Pub.L. 101–601, 25 U.S.C. § 3001, *et seq.* The Corps therefore decided to transfer the remains to an Indian tribe for reburial, and forbade scientific study of the remains. The *Bonnichsen* plaintiffs filed suit to halt the transfer and to enforce what they contend is a legal right to study the remains. The *Asatru* plaintiffs are members of the Asatru Folk Assembly. which is described in their complaint as a legally-recognized church "that represents Asatru, one of the major indigenous, pre-Christian, European

---

1. The skeleton was found by a spectator watching a boat race from the shoreline. A local anthropologist, Dr. James Chatters, examined the cranium at the request of the county coroner. Chatters then went to the scene with the coroner and police, and found several additional bone fragments. After Dr. Chatters concluded that the skeleton was not of recent origin, he contacted the Army Corps of Engineers. The Corps advised Chatters to apply for an "ARPA" permit, which he did. Dr. Chatters then finished excavating the skeleton.

religions." The *Asatru* plaintiffs contend that the remains are actually of European descent, and seek custody of the remains for study and "for eventual reinterment in accordance with native European belief." The Nez Perce Tribe and the Confederated Tribes of the Umatilla Indian Reservation have appeared as *amicus curiae.* According to the brief filed by *amici:*

> The *amici* tribes' traditional beliefs and practices teach them that they have an inherent responsibility to care for those who are no longer alive. When a body goes into the ground, it is meant to stay there until the end of time. When remains are disturbed and remain above the ground, their spirits are at unrest. Handling human remains, the scientific study of human remains, and particularly the destructive study of humans remains are extremely sensitive issues to the *amici* tribes. To put these spirits at ease, the remains must be returned to the ground as soon as possible. These beliefs teach the *amici* tribes to treat those who they share this life with and those who have left them to become a part of the Earth with the utmost respect. The *amici* tribes have requested the United States Army Corps of Engineers to respect those beliefs.

Joint Tribal *Amici* Memorandum at 4–5 (internal citations omitted). The *amici* tribes have opposed plaintiffs' request for permission to study the remains.

Presently before the court are defendants' motion for summary judgment and the plaintiffs' motions for an order allowing them to immediately study the remains. Some of the issues presented in this case are questions of first impression that have not previously been addressed by any court in a published opinion.[2]

For the reasons set forth below, I deny defendants' motion for summary judgment. I conclude that plaintiffs have standing to maintain this action, and that this action has not been mooted. I also conclude that the prior decisions by the Corps of Engineers concerning these remains should be vacated (to the extent those decisions have not already been withdrawn by the agency), and the matter should be remanded to the Corps for further consideration. At the end of this opinion I have included a non-exclusive list of questions that I would like the Corps to consider on remand. This action will be stayed pending completion of the administrative proceedings. The court will retain jurisdiction over this matter. The Corps will maintain custody of the remains until this case is resolved. Plaintiffs' request for permission to study the remains while this action is pending is denied without prejudice. That request should be considered by the Corps on remand along with the other issues.

**Defendants' Motion for Summary Judgment**

### 1. Standing:

Defendants contend the plaintiffs have no standing to maintain this action. Although there are two sets of plaintiffs (*Bonnichsen* and *Asatru* ), the parties have focused upon the question of whether the *Bonnichsen* plaintiffs have standing. I therefore will do the same, unless otherwise noted.

#### a. Legal Standards:

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The "constitutional limitations" are those that are necessary to satisfy Article III's requirement of a "case" or "controversy," without which this court lacks jurisdiction. By contrast, "prudential limitations" are "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), that are "founded in

---

**2.** *Na Iwi O Na Kupuna O Mokapu v. Dalton,* 894 F.Supp. 1397 (D.Haw.1995), is the only published opinion that has considered whether NAGPRA absolutely forbids any handling, examination, or study of human remains. The *Na Iwi* court concluded that examinations conducted for the purpose of accurately identifying the cultural af-filiation or ethnicity of remains are permissible because they further the overall purpose of NAGPRA. *Id.* at 1415. The *Na Iwi* court did not consider whether NAGPRA permits or prohibits scientific studies beyond those needed to help identify the remains.

concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205.

To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that:

(1) he or she has suffered (or is about to suffer) an "injury in fact": an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;

(2) there must be a causal connection between the injury and the conduct complained of: the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2135–37, 119 L.Ed.2d 351 (1992). Plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing these elements. *Id.* at 561, 112 S.Ct. at 2136–37.

Defendants correctly observe that, on a motion for summary judgment, standing is not automatically presumed from the allegations of the complaint but is "an indispensable part of the plaintiff's case" that "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. at 2136. As a practical matter, however, if—in order to have standing—the plaintiff must prove that he *has* in fact been injured by this defendant, and that he *is* entitled to the relief sought, then the court would be obliged to try the entire case just to resolve the threshold question of whether the plaintiff even has standing to maintain the action.

■ For that reason, when deciding whether the plaintiff has standing to maintain an action, the court ordinarily will assume that it has the ability to grant the relief that the plaintiff seeks. The court also will assume the truth of the evidence proffered by the plaintiff, at least where those factual issues are inseparable from the merits of the case itself. *Cf. Winter v. Calif. Medical Review Inc.*, 900 F.2d 1322, 1324 (9th Cir.1990) (the district court may hear evidence on jurisdictional questions and resolve factual disputes regarding that jurisdictional issue to the extent such disputes are separable from the merits of the case itself).

### b. *Analysis:*

Defendants have cited the Supreme Court's decision in *Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, to support their contention that plaintiffs do not have standing. In *Defenders of Wildlife*, the plaintiffs sought a declaration that the Endangered Species Act requires federal agencies to consult with the U.S. Fish and Wildlife Service regarding any activities outside of the United States that those agencies fund or otherwise assist that may adversely impact endangered species. However, the plaintiffs were unable to establish that they personally had been (or were about to be) injured by the government's failure to conduct such consultations.

One of the *Defenders of Wildlife* plaintiffs had previously traveled to Egypt and observed the traditional habitat of the endangered nile crocodile there, and hoped to do so again in the future. She feared that the crocodile's habitat might be harmed by various development projects that the Egyptian government was planning with American assistance. A second plaintiff said she had traveled to Sri Lanka a decade earlier, and while there had attempted to observe certain endangered species but had been unable to see any. She hoped to return to Sri Lanka in the future to try again, and feared that development projects planned for those areas might reduce her chances of successfully viewing those species. *Id.* at 563–64, 112 S.Ct. at 2137–38.

The Supreme Court concluded that this was not enough to establish standing. Even assuming the injuries alleged would otherwise suffice to establish standing, the affiants had failed to demonstrate that those injuries were "imminent." They had no "concrete plans" but only a vague intent to "some day"

travel to these places. *Id.* at 564, 112 S.Ct. at 2138. A plurality of the Court also questioned whether a favorable ruling in that lawsuit would prevent or redress the alleged injury. The defendant in that action was the Secretary of Interior, who oversees the Fish and Wildlife Service, rather than the particular agency or the foreign government that actually was funding or constructing the overseas projects. Those non-parties would not be bound by the court's decision and would not be obliged to adhere to it. Moreover, the foreign governments would be free to continue with the projects, albeit without American assistance. *Id.* at 568–71, 112 S.Ct. at 2140–42 (plurality opinion). Consequently, any benefit to the plaintiffs was speculative at best.

■ In the instant case, the circumstances are far different. In contrast to *Defenders of Wildlife,* the plaintiffs in this action have more than just an abstract interest in human remains overseas. Plaintiffs have asserted—and defendants have not disputed—that plaintiffs have devoted much of their careers to studying the origins of humanity in the Americas and are among the foremost experts in this field. Plaintiffs also have asserted, and defendants have not disputed, that—based upon the preliminary testing performed before the defendants intervened and halted further testing—the remains at issue appear to be one of the most ancient human skeletons ever discovered in North America and one of the best preserved skeletons from that era. In addition, plaintiff, have asserted that the preliminary studies raised questions regarding the racial origin of the man that—if substantiated by additional tests—could significantly alter traditional scientific theories concerning the history of humanity in the Americas.

Unlike the affiants in *Defenders of Wildlife,* the *Bonnichsen* plaintiffs have presented concrete plans, including a detailed description of the tests that each plaintiff proposes to conduct. These are not tests that they hope to conduct "some day"; plaintiffs desire to commence those tests immediately, if they are permitted to do so. *Cf Defenders of Wildlife,* 504 U.S. at 563–64, 112 S.Ct. at 2137–38. It also is undisputed that plaintiffs have the means—*i.e.,* the skill and equipment—that is required to perform those tests. Plaintiffs have identified a particular set of remains that they desire to study, they have presented a concrete plan for conducting those studies, and they are ready, willing, and able to commence those tests immediately.

Defendants contend this is all insufficient, and compare plaintiffs to a keeper of Asian elephants at the Bronx Zoo who claims standing to contest every development project or event anywhere in the world that potentially could harm Asian elephants or their habitat. *See Defenders of Wildlife,* 504 U.S. at 566, 112 S.Ct. at 2139–40. The analogy is inappropriate. Plaintiffs do not assert an abstract right to oppose any activity, anywhere in the world, that might damage ancient human remains or the places where such remains potentially could be found. Rather, they seek to study one specific skeleton, and have a detailed plan and timetable for those studies.

Although the results of these studies might be of interest to the general public, plaintiffs are not asserting a mere general grievance or interest that is shared by the world at large. *Cf. Defenders of Wildlife,* 504 U.S. at 573–78, 112 S.Ct. at 2143–46. The plaintiffs have asserted a personal interest in this controversy. They propose to personally conduct tests on the remains, and to analyze the results of those tests. This data will then be used to further their ongoing research. That is a sufficient nexus to confer standing. *Cf. Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230 n.4, 106 S.Ct. 2860, 2866 n.4, 92 L.Ed.2d 166 (1986) (allegation by plaintiff organization that the whale watching and studying of their members will be adversely affected by continued whale harvesting was sufficient to confer standing); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (organization has standing to contest construction of destination resort if members of organization allege that the proposed project would interfere with their aesthetic or recreational use of the area). In addition, I note that the results of plaintiffs' research likely will be published in

various scientific journals and could advance their professional careers.

Plaintiffs have also asserted, and defendants have not disputed, that—until defendants interceded and seized custody—the remains were in transit to the Smithsonian Institution,[3] where they were to have been examined by plaintiff Owsley. The Corps' internal reports support plaintiffs' version of events:

> d. On 31 August 1996, Dr. Douglas Owsley, Division Head for Physical Anthropology at the Smithsonian Institution's National Museum of Natural History, wrote to the Benton County Coroner. Dr. Owsley offered the coroner's archeologist, Dr. Chatters, airline accommodations in order to afford he [*i.e.,* Dr. Owsley] and other Museum staff an opportunity to conduct an extensive evaluation of the skeleton here in Washington, D.C.
>
> e. Upon learning of this offer, and having assured the coalition of [redacted] basin tribes and bands that the skeleton would not be subjected to further desecration via scientific study, the Walla Walla Commander had the remains moved to the archeology laboratory operated by the Battelle Corporation near Hanford, Washington.
>
> \* \* \* \*
>
> g. Throughout the implementation of the NAGPRA process, Dr. Owsley has repeatedly requested access to the skeleton for additional analysis ... He and all other members of the scientific community have been denied direct access because of the district's commitment to the tribal coalition.

(COE 0758–760) (report from Paul Rubenstein to the Commander of the Corps of Engineers, dated October 16, 1996.) By their own statement, the defendants' actions directly and immediately interfered with plaintiff Owsley's conduct in relation to these remains. Defendants also ordered the immediate termination of all tests of the remains (or fragments thereof) that were then in progress, and have prohibited any resumption of those tests. Other plaintiffs have attested that, once the remains had arrived at the Smithsonian, they intended to request, and would have received, permission to study the remains. Again, defendants' actions directly interfered with those plans.

Defendants contend that the decision to allow such study is discretionary, hence there is no guarantee that plaintiffs ever would have received permission to study the remains and thus any injury to them is merely speculative. Defendants likewise argue that the injury will not be redressed by a favorable ruling in this case, since plaintiffs will not have an absolute right to study the remains. Plaintiffs have responded with affidavits attesting that such requests for permission are routinely granted.[4]

I am satisfied that "but for" defendants' intervention, plaintiff Owsley already would have been allowed to study the remains, and it is highly probable that some or all of the other plaintiffs also would have been allowed to conduct such studies. That is particularly true in view of the apparent magnitude of the discovery and the undisputed prominence of the plaintiff scientists in their field. I also am satisfied that if the court grants the requested relief it is at least "likely" that plaintiffs will be permitted to study the remains and the alleged injury will be redressed. *Cf. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136–37 (it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision). Indeed, there could be no doubt about "redressability" if plaintiffs ultimately prevail on their claim that they have a First Amendment right to study the remains.

Plaintiffs have adequately established that there is a genuine case or controversy between adverse parties sufficient to confer jurisdiction upon this court. Plaintiffs have

---

**3.** At oral argument, there was some question as to whether the Smithsonian Institution was considered a "federal agency" for purposes of NAGPRA. It is not. *See* 25 U.S.C. § 3001(4) (Smithsonian is not considered a "federal agency" for purposes of this statute.)

**4.** At this stage of the case, I elect not to resolve the party's conflicting views upon the applicability or interpretation of the various curation regulations and similar rules. There will be time to litigate those issues later if required for the ultimate disposition of this case.

adequately alleged an injury in fact, that is fairly traceable to the actions of the defendants, and likely would be redressed by a favorable decision on the merits. Plaintiffs therefore satisfy the jurisdictional requirements of Article III.

#### c. *Zone of Interests:*

■ Defendants next contend that plaintiffs do not fall within the "zone of interests" sought to be protected or regulated by NAG-PRA. Unlike the jurisdictional requirements of Article Ill, the "zone of interests" test is a judicially self-imposed "prudential" limitation. *Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett,* —— U.S. at ——, 117 S.Ct. at 1161. As the Court explained in *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987):

> The "zone of interest" test is a guide for deciding whether ... a particular plaintiff should be heard to complain of a particular agency decision. In cases *where the plaintiff is not itself the subject of the contested regulatory action,* the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purposes to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. at 757 (emphasis added). To put it another way, the primary purpose of the "zone of interests" test is to prevent a statute or regulation from being perverted to a purpose, or used in a manner, that Congress clearly never intended. In some cases, the rule may also reflect a concern that—because of his unique interest or motives, which differ from the "typical" plaintiff that Congress had envisioned—this

is not the proper plaintiff to bring the particular action and to establish a precedent that effectively could bind others who have a more direct interest in the subject matter. *Cf Hernandez–Avalos v. INS,* 50 F.3d 842, 846 (10th Cir.1995) (essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.)

■ The present action is not barred by the zone of interests rule. The rule applies only *"where the plaintiff is not itself the subject of the contested regulatory action."* *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757 (emphasis added). The plaintiffs in this action are directly implicated by the contested regulatory actions. They personally have been forbidden to study the remains. Nor are "the plaintiff's interests ... so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id. See also Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1581–83 (9th Cir.1993) (zone of interests test did not preclude Sierra Club from challenging telescope project even though statute at issue was enacted by Congress for the purpose of overriding environmental laws and facilitating construction of the telescope project; Sierra Club's lawsuit could be viewed as effort to ensure that agency complied with its responsibilities under the statute).

Defendants erroneously assume that the only persons who have standing to contest agency action relating to NAGPRA are those who seek to invoke NAGPRA to enforce a right to obtain possession of remains or cultural objects pursuant to that statute. However, there is no reason why a person would not also have standing to contest agency action that cites NAGPRA as the justification for *denying* that person's rights (or alleged rights) to possession of, or to study, specific remains or cultural objects.

A person potentially may be injured by either *under*-enforcement or *over*-enforcement of a law. *Cf. Bennett,* —— U.S. at ——, 117 S.Ct at 1163. In *Bennett,* the Court held that the Endangered Species Act authorizes both actions against the Secretary asserting

under-enforcement of the law and also actions asserting over-enforcement, at least where the plaintiff can show a direct injury to himself as a result of the Secretary's actions that likely would be redressed by a favorable ruling in the lawsuit. The Court rejected the government's contention that only those who seek more environmental protection have standing to sue.

The language of NAGPRA, 25 U.S.C. § 3013—the district courts have "jurisdiction over *any* action brought by *any person* alleging *a violation of this chapter*" (emphasis added)—is broad enough to encompass such an over-enforcement claim, provided the plaintiffs allege a direct injury to themselves as a result of the misapplication of the statute and not just a general grievance or remote injury.

I conclude that that the *Bonnichsen* plaintiffs' claims are not barred by the "zone of interest" rule and they do have standing to maintain this action.[5]

Although neither party addressed the issue in their briefs, I also have considered whether the *Asatru* plaintiffs have standing to maintain this action. *See WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir.1997) (when in doubt, a federal court must *sua sponte* evaluate whether it has subject matter jurisdiction); *Mt. Graham Red Squirrel*, 986 F.2d at 1581 (court has obligation to raise issue of standing *sua sponte*).

■ I conclude that the *Asatru* plaintiffs do have standing. The *Asatru* plaintiffs contend that they are entitled to possession of the remains, and that the defendants erred by not adequately considering their rights and by not allowing tests to be conducted that would support or refute their claim to the remains. The *Asatru* plaintiffs also have raised various issues regarding the constitutionality of NAGPRA as applied to them and to these remains. I conclude that, regardless of the ultimate merits of their claims or of the legal theories upon which those claims are based, the *Asatru* plaintiffs have ade-

quately alleged an injury in fact, fairly traceable to the conduct of the defendants, that likely would be redressed by a favorable decision. Accordingly, they have standing to maintain this action.

### 2. *Ripeness and Mootness:*

Defendants have asked the court to dismiss this action on grounds it is not ripe and there is no final agency action to review. I previously denied defendants' motion to dismiss on the same grounds. In that opinion, I found that the Corps had made a number of "final" decisions, including:

(1) that it would assert jurisdiction over and take custody of the remains;

(2) that the remains were of Native American ancestry;

(3) that the remain were subject to NAGPRA;

(4) that the remains were discovered inadvertently on Federal land;

(5) that the land on which the remains were discovered is recognized as the aboriginal land of an Indian tribe;

(6) that there is a relationship of shared group identify which can be reasonably traced between the human remains and five Columbia River basin tribes and bands; [and]

(7) that the remains should be turned over to a tribe for burial.

Opinion of February 19, 1997, at 969 F.Supp. at 621. On March 23, 1997, after I issued my earlier decision, defendants published a "Notice Rescinding Notice of Intent to Transfer Custody of Human Remains in the Custody of the U.S. Army Corps Engineers, Walla Walla District." According to the March 23rd notice:

Notice is hereby given that the previous Notice of Intent . . . is hereby rescinded.

\* \* \* \*

[The] Corps is seeking to determine which of the claimants, if any, are the closest culturally affiliated. 25 U.S.C.

---

5. Defendants also contend that plaintiffs lack standing to maintain this action because the rights they assert are non-existent. The issue of standing should not be confused with the merits

of the underlying action. For purposes of determining whether plaintiffs have standing, I must assume that the court does have the capacity to grant the requested relief.

§ 3002(a)(2)(B). The following types of evidence are used to make this determination: Geographical, kinship, biological, archeological, anthropological, linguistic, folklore, oral tradition, historical, or other relevant information or expert opinion. 43 C.F.R. § 10.14(a). The Corps will consider evidence presented on all issues related to its decision, including, but not limited to, whether a disposition under NAGPRA is appropriate.

Defendants then moved to dismiss this action on grounds that no final decision had been reached on the issues in this case. Defendants also have opposed plaintiffs' motion to study the remains, arguing that the motion is premature because the Corps has not yet decided whether to permit such studies.

■ I question defendants' characterization of the issue as one of ripeness. Rather, the question posed is whether as a result of the March 23rd notice, this case is now moot. Plaintiffs argue that the March 23rd notice is merely a "sham" intended to deprive this court of jurisdiction over the controversy. They cite various documents as evidence that the defendants remain fully committed to the positions announced earlier.

On the surface, it would appear from the March 23rd notice that the Corps of Engineers is reconsidering its position and has withdrawn its prior decisions.[6] However, on April 23, 1997, the Corps filed a legal memorandum with this court which declared that:

Because Kennewick Man is either of or related to the indigenous peoples [of America], the remains fits within the definition of Native American as provided for by NAGPRA ... Because under the plaintiffs' own scenario, the remains fit within NAGPRA's definition of Native American, the only conclusion is that they are subject to NAGPRA.

April 23rd Memorandum at page 5. On April 25, the government filed a second legal memorandum with this court, which asserted that the plaintiffs had no right to study the remains:

Because there is no provision for scientific studies under the disposition provisions of NAGPRA, there is no right to conduct scientific studies where those provisions apply. Because those provisions apply to the present case, there is no right to study here.

April 25th Memorandum at page 23.

■ The Corps cannot publicly maintain that it has an open mind on these questions, and insist that it has not reached any decision, while simultaneously filing memoranda with this court asserting that the remains are Native American, that they are subject to NAGPRA, that the remains are subject to the disposition provisions of NAGPRA, that NAGPRA forbids scientific study, and that plaintiffs have no right to study the remains.[7] It would seem that notwithstanding the Notice published on March 23rd, the Corps remains firmly committed to its previously announced position on the matters in controversy.[8]

6. Plaintiffs observe that the notice continues to cite NAGPRA as the authority for the actions taken, to utilize NAGPRA terminology and standards, and to focus upon cultural affiliation, a concept that has relevance only under NAGPRA. By themselves, those factors are not necessarily inconsistent with the statement in the notice that the Corps is continuing to evaluate all issues, including whether a disposition under NAGPRA is appropriate.

7. At oral argument, the Corps' attorney sought to distance her client from the statements in the memorandum filed on behalf of her client. (June 2 tr. at 17–18.) However, the views expressed in a legal memorandum filed with this court are presumed to fairly represent the position of the client in the matter. Likewise, I am not persuaded by defendants' argument that the statements were intended to refer only to some hypothetical

scenario. The statements contain an affirmative statement of the Corps' interpretation of the controlling legal principles in this case and how those principles apply to a given set of facts.

8. In my prior opinion, I stated that:

In deciding whether there was a "final" decision by the Corps, usually the record must speak for itself. As a general rule, the court ordinarily will not inquire into the minds of the agency officials to determine what they actually intended, though there are some exceptions to that rule. The court may of course consider judicial admissions by a party. The converse is also true. With limited exceptions, agency officials may not offer testimony to contradict, supplement, or explain the written record. The court must assume the officials said what they meant, and meant what they said.

Plaintiffs also cite internal Corps documents to support their contention that the Corps has made a firm decision on the issues in this case. They cite an e-mail dated September 18, 1996, from Col. Bohn to Lt. Curtis, Paul Rubenstein, and others, which concludes that:

> All risk to us seems to be associated with not repatriating the remains in accordance with NAGPRA and the claim by the tribes ... Now that the locals understand the law and their potential liability, they are distancing themselves from the scientist.

(COE 0650.) Another e-mail bearing the same date, from Rubenstein to Col. Bohn and others, states, "I concur completely that repatriation is the appropriate course of action." (COE 0650). The author also asks, "Is the district's position, in the opinion of counsel, legally defensible? ... Is it prudent to publicly announce a course of action prior to the DCW informing Congressional interests?" (COE 0650–651). Finally, the author acknowledges that with respect to the Corps' ultimate resolution of the issue, "tribal concerns are paramount." (COE 0651).

A memo, dated September 4, 1996, regarding "P[ublic] A[ffairs] Plan—Discovered American Indian Human Remains," recites that:

> The District needs to make clear, unequivocal demonstration of its commitment to the tribes as being a compassionate and supportive partner in restoring the remains to a condition of proper interment with dignity and respect, and full compliance with the spirit and letter of all existing laws.

(COE 0656–658) (from Duane "Dutch" Meir, chief of public affairs, to a long list of recipients.) The memo also indicated that the Corps would seek to minimize any media coverage of this story, and that the remains "should be reintered ... and protected from further disturbance, as soon as possible." (COE 0657). The Corps "will assume the costs related to reinterment of [the] remains ..." (COE 0657). The memo was marked "approved" by several levels of Corps officials, including Ray Tracy, whose affidavit the Corps now presents to establish that no decision has been made.

In a report to the Commander of the Corps, dated October 16, 1996, Paul Rubenstein reported Dr. Owsley's offer to have the remains flown to the Smithsonian Institution for an extensive evaluation.

> e. Upon learning of this offer, *and having assured the coalition of [redacted] basin tribes and bands that the skeleton would not be subjected to further desecration via scientific study,* the Walla Walla Commander had the remains moved to the archeology laboratory operated by the Battelle Corporation near Hanford, Washington.
>
> \* \* \* \*
>
> g. Throughout the implementation of the NAGPRA process, Dr. Owsley has repeatedly requested access to the skeleton for additional analysis ... He and all other members of the scientific community have been denied direct access *because of the district's commitment to the tribal coalition.*

(COE 0758–760) (emphasis added). Plaintiffs cite these and other documents as evidence that—notwithstanding the Corps' repeated denials that it has made a decision—the Corps in fact took a position very early in this controversy, before it had the relevant facts or understood the legal issues, and continues to adhere to that position even today.

■ A federal court may not dismiss an action for mootness unless it concludes "with assurance" that "there is no reasonable expectation that the alleged violation will recur" and it is plain that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (internal punctuation and citations omitted). A case is moot when the issues presented are no longer "live" or the parties

---

Opinion of February 19, 1997 at 969 F.Supp. at 620–621. I remain committed to that position. The problem here is that the Corps asserted one position in its published notice, but then asserted a contrary position in two memoranda to the court filed just one month later.

lack a legally cognizable interest in the outcome. *Davis*, 440 U.S. at 631, 99 S.Ct. at 1383.

◼ Under the circumstances presented here, it is the defendant who bears the "heavy burden" of demonstrating that the action has now become moot. *See Davis*, 440 U.S. at 631, 99 S.Ct. at 1383; *United States v. WT Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953); *Kennecott Utah Copper Corp. v. Department of Interior*, 88 F.3d 1191, 1201 (D.C.Cir.1996); *Doe v. Harris*, 696 F.2d 109, 112 (D.C.Cir. 1982).

In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the Supreme Court described the applicable legal standards:

It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

\* \* \* \*

The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways. A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

*Id.* at 289, 102 S.Ct. at 1074–75 (citations and punctuation omitted).

◼ A change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy. *Armster v. United States District Court*, 806 F.2d 1347, 1357 (9th Cir.1986) (refusing to dismiss action as moot even though agency had belatedly withdrawn directive that precipitated the action).

◼ The courts are particularly reluctant to find an action moot when the defendant voluntarily ceases the challenged conduct in the face of a pending lawsuit but continues to assert the lawfulness of the challenged conduct. *See, e.g., Armster*, 806 F.2d at 1359–60 (citing authorities); *Allende v. Shultz*, 845 F.2d 1111, 1115 n.7 (1st Cir.1988) (voluntary cessation of challenged activity did not moot controversy where the government has not revised its interpretation of the relevant statute); *City of New York v. Baker*, 878 F.2d 507, 511 (D.C.Cir.1989) (declining to find that action had been mooted where the "government has not renounced" its prior position); *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 74 F.3d 1308, 1311 (C.A.D.C. 1996) (following *Allende* and *Baker*); (*Alton & Southern Railway v. International Ass'n of Machinists*, 463 F.2d 872, 879 n.13 (C.A.D.C. 1972) ("a deliberate and persistent official interpretation is more likely to identify a 'recurring controversy' situation"); *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491–92 (D.C.Cir. 1988) (agency could not moot action by belatedly acceding to specific request for information while continuing to adhere to unlawful policy or practice that makes repetition of this controversy likely)).

As the Third Circuit explained,

Courts are understandably reluctant to permit agencies to avoid judicial review, whenever they choose, simply by withdrawing the challenged rule.

*Dow Chemical Co. v. USEPA*, 605 F.2d 673, 678 (3d Cir.1979).

In *Dow Chemical*, the EPA withdrew the challenged rule, but only because Dow's petition raised questions regarding the EPA's compliance with the procedural requirements of the APA. However, the agency left no doubt that it did not intend to change its interpretation of the scope of its statutory authority, about which it "entertains no doubt," and would soon enact a new rule substantially similar to the one that was rescinded, but this time adhering to all procedural requirements of the APA. There was no reason to postpone review, since the underlying issue—whether the agency had the authority to enact the rule—was not moot,

and did not turn upon the precise language of the new rule or any new facts. The issue was all but certain to recur in the near future, it was just a matter of when, not if. *Id.* at 679. The challenged governmental activity had not evaporated or disappeared; by its "continuing and brooding presence" it adversely affected the interests of the petitioning parties. *Id.* at 679–80.[9]

I conclude that this action has not been mooted by the March 23rd notice. There continues to be a case and controversy between adverse parties. The dispute here concerns a tangible object, whose custody remains in dispute, and also the rights of various parties to study (or to forbid the study) of that object.

The "agency action" at issue here is more than just the decision to convey the remains to a particular tribe. It also includes the decision to seize the remains, and to forbid any study of those remains. Those actions have already occurred, have already deprived the plaintiffs of their (alleged) rights, and continue to this day. This is not a dispute over a proposed rule or policy, where the dispute vanishes once the proposal is withdrawn. Nor is this like a proposed construction project that, once withdrawn, ceases to exist unless and until the agency resurrects the proposal. From the standpoint of the plaintiffs in this action, maintaining the status quo will not prevent the alleged injury, it perpetuates it.

Nor am I persuaded that the Corps has entirely abandoned its earlier decision and is now objectively considering the evidence and the law without any preconceived notions concerning the outcome. After reviewing the briefs and the excerpts from the administrative record filed by the parties, I am left with the distinct impression that early in this case the defendants made a hasty decision before they had all of the facts, or even knew what facts were needed. In addition some of the "facts" upon which the Corps relied have proven to be erroneous, *e.g.*, that the site at which the remains were discovered is recognized as the aboriginal land of an Indian tribe.

I also question whether the agency gave adequate consideration to the question of whether NAGPRA applies to these remains, or the significance for this case if NAGPRA either does (or does not) apply. Agency officials appear to have recognized that there was a problem, but were unsure how to resolve it. A memorandum dated September 3, 1996, entitled "CENPD Comments regarding the Disposition of Culturally Unidentifiable Human Remains and Associated Funerary Objects,"[10] identifies some of the issues the Corps needed to confront with respect to ancient remains:

2. If Native American groups claim "shared group identity" they can essentially take control of human remains, no matter how old they are. *Do federal agencies and/or museums have any recourse if their research indicates otherwise?* A dispute resolution mechanism, *especially for unusually old remains*, needs to be included in these recommendations.

\* \* \* \*

6. The NAGPRA Review Committee mentions another category of unidentifiable human remains as "generally very an-

---

9. *See also Doremus v. United States*, 793 F.Supp. 942, 944–46 (D.Idaho 1992) (challenge to revocation of special use permit was not mooted when the agency belatedly rescinded the decision, but insisted the decision had been correct, that the permit holder was in violation of the terms of the permit, and that the agency withdrew the decision only to show its good faith in cooperating with the permittee to resolve the dispute); *Doe*, 696 F.2d at 113 ("when a complaint identifies official conduct as wrongful and the legality of that conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition"); *Solar Turbines, Inc. v. Seif*, 879 F.2d 1073, 1079 (3d Cir.1989) ( petition for review of EPA order was not rendered moot by

EPA's withdrawal of order inasmuch as EPA had not altered its position on the merits; "we cannot allow the agency to control the timing and venue of judicial review by its own procedural maneuvers"); *Southern Pacific Transport, Co. v. Public Utility Commission*, 9 F.3d 807, 809–10 (9th Cir.1993) ( action was not mooted by rescission of challenged rule when agency's authority to enact such rules in the future was still at issue).

10. "CENPD" is the Corps of Engineers North Pacific Division regional headquarters in Portland (in whose jurisdiction the remains were found).

cient human remains," but ventures no further comment except that *decisions regarding their disposition will require Congressional amendments to NAGPRA.* Just as they did for consideration of claims by non-federally recognized tribes, the NAGPRA Review Committee may wish to recommend this special subcategory of culturally unidentifiable human remains *for study before repatriation by tribes.* In doing so they should consult with nationally recognized scientific organizations and professional societies for their recommendations for specific study, detailing procedures, time for study, and for reporting study results to tribes and the scientific community.

\* \* \* \*

*A real serious issue regards the accidental finding of very ancient cultural remains as has just recently occurred in NPW. The proposed rules are silent and there is serious scientific disagreement about the disposition of such finds.* Tribal interests wish to pursue repatriation generally without any scientific analysis, while the archeological community wishes to gain the extremely valuable scientific data from such a discovery prior to repatriation.

\* \* \* \*

Because many disciplines, organizations, and research interests could potentially be involved with this particular data set, it is extremely important that the NAGPRA Review Committee draw upon recommendations from the affected Indian tribes and a respected independent scientific source such as the National Academy of Sciences to jointly develop a scientific screening process for this special subcategory of human remains. *This information could be the basis for a NAGPRA amendment.*

7. The problem in the existing NAGPRA process for treatment of this subcategory of culturally unidentified human remains is the age of the remains. *With specimens in the 9,000–10,000 year age range close affinity with any historic ethnic group would be tenuous. These kinds of re-*

*mains, however, will almost always be claimed by contemporary tribes as ancestral, regardless how removed they may be.* Tribes or shared groups of tribes can be expected to dutifully pursue the protection and repatriation of any ancestral human remains found on Indian lands or within their ceded territories as their stewardship responsibility, even if they cannot trace direct kinship to the find itself.

8. From a strictly scientific standpoint, *the fact is that we do not really know how very ancient human remains might be related to contemporary Indian peoples. This fact alone would seem to merit some intermediate screening process that would provide for some kinds of study by qualified professionals and organizations prior to reburial by remote ancestors.... The issue here is not repatriation of the ancient human remains by the tribes, only that inadvertent discoveries that fall into this very ancient subcategory of culturally unidentifiable human remains should be studied before they are reburied.* \* \* \* \*

(COE 0663–0666) (emphasis added). I recognize that this may have been a "pre-decisional" document, and that agency officials sometimes float ideas within the walls of the agency that do not represent the agency's formal position. However, this memorandum was dated September 3, 1996—only days before the Corps issued its notice of intent to transfer the remains to the tribes. A copy of this memorandum was sent to the Commander of the Corps on or about October 16, 1996, which was several weeks *after* that decision was announced and the very same day that this action was filed. During this same time period the Corps was publicly asserting that the law was clear, and that there was no doubt as to the proper disposition of the remains, the application of NAGPRA, or that NAGPRA forbids scientific study of the remains. The record suggests that Corps officials harbored doubts on those points, but chose to suppress those concerns in the interests of fostering a climate of cooperation with the tribes.[11]

---

11. The Corps was not alone in its uncertainty regarding the treatment of "culturally unidentifiable human remains." The legislative history of

NAGPRA includes a discussion of the findings and recommendations by the Panel of National Dialogue on Museum–Native American Rela-

I also note that the NAGPRA Review Committee mentioned in the memorandum is a committee established by Congress as an integral part of NAGPRA and specifically charged, *inter alia*, with overseeing implementation of certain portions of the law and consulting with the Secretary of Interior in the development of regulations to implement NAGPRA. 25 U.S.C. § 3006. By contrast, the Corps of Engineers is just one of many federal agencies that might occasionally address NAGPRA issues when a discovery is made on real property under the jurisdiction of that particular agency. This is not a case where the agency is solely responsible for administering a particular statutory scheme, and for drafting and interpreting the regulations to implement that law. To the extent there is any special agency expertise here, it is the NAGPRA Review Committee, and the Secretary of Interior [12]—rather than the Corps of Engineers—that presumably possess the greater level of expertise with regard to the interpretation and implementation of NAGPRA.

■■■■ With multiple agencies separately interpreting and administering the statute, depending upon the fortuity of where the remains are found, there is the potential for inconsistent interpretations. For that reason, the court is inclined to pay particular attention to the comments of the NAGPRA Review Committee, notwithstanding that it primarily functions in a consulting role,[13] and to be less deferential than usual to the Corps' interpretation of the statute and regulations. *Cf. United States Dept. of Treasury v. Federal Labor Relations Authority,* 996 F.2d 1246, 1250 (D.C.Cir.1993) (agency's interpretation of rules promulgated by a different agency is not entitled to the deference that might be accorded to an agency's interpretation of its own regulations.) *See also Chevron v. Natu-*

tions. "The Panel was split on what to do about human remains which are not culturally identifiable. Some maintained that a system should be developed for repatriation while others believed that the scientific and educational needs should predominate." H.R.Rep. No. 877, 101st Cong., 2d Sess. 10–11 (Oct. 15, 1990), *reprinted* in 1990 U.S.C.C.A.N. 4367, 4369–70. The Panel's full report was included as an exhibit to the congressional hearings on NAGPRA. *Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects: Hearings on H.R. 1381, H.R. 1646, and H.R. 5237 before the House Committee on Interior and Insular Affairs,* 101st Cong., 2d Sess. 196 (1990).

During the congressional hearings on NAGPRA, several witnesses testified that the problem posed by remains that cannot be identified as culturally affiliated with any modern tribe was "the one big unanswered question" that had not yet been resolved in the course of drafting the proposed legislation. *See, e.g., Native American Grave and Burial Protection Act: Hearing on S. 1021 and S.1980 before the Senate Select Committee on Indian Affairs,* 101st Cong., 2d Sess. 33 (1990) (colloquy between Senator McCain and Jerry Rogers, Associate Director of Cultural Resources for the National Park Service). *See also* McManamon and Nordby, *Implementing the Native American Graves Protection and Repatriation Act,* 24 Ariz. St. L. J. 217, 225 (1992) (asking whether "properly affiliated claimants exist for human remains or cultural items excavated from archaeological sites thousands or tens-of-thousands of years ... [old], such as those assigned to Paleoindian or Archaic cultures," and observing that "NAGPRA does not address the issue of ancient cultures.")

The Secretary of Interior was expected to promulgate regulations governing the disposition of "culturally unidentifiable human remains." At this writing, however, that task has not been completed. *See* 43 C.F.R. § 10.11 ("Reserved").

12. Section 13 of NAGPRA directs the Secretary of Interior to promulgate regulations for the implementation of NAGPRA.

13. The legislative history of NAGPRA indicates some initial concern that formation of the Review Committee could violate the Appointments Clause of the Constitution unless the appointees were subject to confirmation by the Senate. The House Committee on Interior and Insular Affairs and the Department of Justice eventually concluded that confirmation was not required since the Review Committee is advisory only, and NAGPRA "does not accord binding legal force to the Review Committee's actions." H.R.Rep. No. 877, 101st Cong., 2d Sess. 16, 28–29 (Oct. 15, 1990), *reprinted* at 1990 U.S.C.C.A.N. 4367, 4375, 4387–88 (2d Sess.)

Although the NAGPRA Review Committee is advisory, its views nonetheless "will be an important consideration for any action that the Secretary [of Interior] must take." McManamon and Nordby, *Implementing NAGPRA,* 24 Ariz. St. L. J. at 228–29. The court observes that the United States Fish and Wildlife Service often acts in a consulting role when fulfilling its responsibilities under the Endangered Species Act and other statutes, but that does not diminish the deference given.to that agency's findings and recommendations. *See, e.g., Lone Rock Timber Co. v. United States Dept. of Interior,* 842 F.Supp. 433, 437 (D.Or.1994).

*ral Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (deference is given to agency's interpretation of statute *that it administers); 1185 Avenue of the Americas Associates v. Resolution Trust Corp.,* 22 F.3d 494, 497 (2d Cir.1994) (where Congress has entrusted more than one federal agency with the administration of a statute, a reviewing court does not owe as much deference as it might otherwise give if the interpretation were made by a single agency similarly entrusted with powers of interpretation) (citing *Lieberman v. FTC,* 771 F.2d 32, 37 (2d Cir.1985)); *Tsosie v. Califano,* 651 F.2d 719, 722 (10th Cir.1981) (agency's interpretation of another agency's statutes and regulations is not entitled to special deference).

It appears that the NAGPRA Review Committee recognized the problems posed by ancient remains, but could not agree on how to resolve that issue. This may be a policy question that ultimately must be resolved by Congress.

### 3. *The Decisions Must be Vacated and the Matter Remanded:*

For now, the immediate question is what to do with these remains and this lawsuit. The agency contends that it has withdrawn its prior decisions and desires to gather additional evidence and to reconsider the matter. Plaintiffs question defendants' sincerity, but the point is largely academic. If I accept defendants' representation that the decisions have been vacated, then I must remand the matter to the agency for further consideration and development of the record. If I find that the decisions have not been withdrawn, then on this record I have little choice but to vacate those decisions and remand the matter to the agency for reconsideration.

■ Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ..." 5 U.S.C. § 706(2)(A); *Northwest Motorcycle Ass'n v. United States Dept. of Agriculture,* 18 F.3d 1468, 1471 (9th Cir.1994). The court "must consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." *Northwest Motorcycle,* 18 F.3d at 1471. Depending upon the circumstances, the agency's failure to gather or to consider relevant evidence may be grounds for setting aside the decision. *See Mt. Diablo Hospital v. Shalala,* 3 F.3d 1226, 1232 (9th Cir.1993) (citing *Pillai v. Civil Aeronautics Bd.,* 485 F.2d 1018, 1027 (D.C.Cir.1973)).

■ After considering the relevant data, the agency must articulate a satisfactory explanation of its action including a rational connection between the facts found and the choice made. *Northwest Motorcycle,* 18 F.3d at 1471. An agency decision will not be upheld under the arbitrary and capricious standard unless the court finds that the evidence before the agency provided a rational and ample basis for its decision. *Id.* An agency's decision may also be set aside if the agency has relied on factors that Congress has not intended the agency to consider, has entirely failed to consider an important aspect of the problem, has offered an explanation for its decision that runs counter to the evidence before the agency, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Inland Empire Public Lands Council v. Glickman,* 88 F.3d 697, 701 (9th Cir.1996).

■ When the agency's decision turns at least in part upon the construction of a statute or regulation, the court must consider whether the agency correctly interpreted and applied the relevant legal standards. When Congress has unambiguously expressed its intent, that is controlling. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. If the statute is silent or ambiguous concerning the issue in dispute, the court next inquires whether the agency is construing a statute that it administers or regulations that it has promulgated. *Id.* at 842–44, 104 S.Ct. at 2781–83. If the answer is yes, the agency's construction will be upheld if it is based upon a "permissible construction of the statute" or regulation. *Id.; Northwest Motorcycle,* 18 F.3d at 1471. However, similar deference is not afforded to an agency's interpretation of

a statute that it does not administer, or of regulations that were promulgated by other agencies. *Dept. of the Treasury,* 996 F.2d at 1250; *1185 Avenue of the Americas,* 22 F.3d at 497; *Tsosie,* 651 F.2d at 722.

■■■ Here, the agency clearly failed to consider all of the relevant factors or all aspects of the problem. The agency acted before it had all of the evidence or fully appreciated the scope of the problem. The agency did not fully consider or resolve certain difficult legal questions. The agency assumed facts that proved to be erroneous. The agency failed to articulate a satisfactory explanation for its action. By the agency's own admission, any decision in this matter was premature and ought to be set aside and the matter remanded to the agency for further consideration.[14]

Regardless of whether I grant the agency's request for a remand, or the plaintiffs' request to set aside the decision, the end result essentially is the same. The matter must be remanded to the agency for further review. To the extent that defendants' inconsistent statements have created any question as to the continuing validity of the prior decisions, I now dispel those doubts by formally vacating those decisions. Since this matter concerns a *res* (the remains), I will retain jurisdiction to ensure that the interests of all parties are protected during the interim.

I have not determined that the Corps' decisions were "wrong." I am not deciding today who ultimately is entitled to custody of the remains, or whether the scientists should be permitted to conduct any tests upon those remains. Rather, what I have determined is that the agency's decision making procedure

was flawed. As a result, I am directing the Corps of Engineers to fully reopen this matter, to gather additional evidence, to take a fresh look at the legal issues involved, and to eventually reach a decision that is based upon all of the evidence, that applies the relevant legal standards, and that provides a clear statement of what the agency has decided, and the reasons for that decision.

The court will retain jurisdiction in the interim. I will ask the parties to submit periodic status reports advising me of their progress. I will not give the Corps a specific deadline for making its decision, but I do expect the Corps to proceed expeditiously and the court has the authority to intercede if the issues are not being addressed in a timely manner.

For now, the government shall retain custody of the remains and may not dispose of them pending resolution of this controversy. To avoid inadvertently mooting this case, the remains shall continue to be stored in a manner that preserves their potential scientific value.

**Plaintiffs' Motions to Study the Remains:**

Also before the court are plaintiffs' motions to study the remains. This primarily is a discovery motion, but plaintiffs also have asserted an independent First Amendment right to study the remains. While legally that claim may be distinguishable from the challenged administrative action, as a practical matter the two are intertwined. The court therefore will deny plaintiffs' request to study the remains, with leave to renew that request, if necessary, after the Corps of Engineers has completed its investigation and reached a new decision. The Corps, in its

14. The procedural posture of this case is somewhat awkward. Plaintiffs have not moved for summary judgment and the parties have not officially briefed the question of whether the agency's decision should be set aside. Nor have defendants formally filed the full administrative record. Despite those deficiencies, over the course of the preceding eight months this court has had ample opportunity to become familiar with the case. The court has carefully reviewed the agency's decision, the excerpts of record submitted by the parties, the briefs, and the responses to discovery requests. There also have been three full oral arguments, at which the parties

articulated their positions at some length. The court is satisfied that it adequately understands the case, and the positions of the parties, and that further briefing on this topic would not be beneficial. The court also is satisfied that the defects already identified in the Corps' decision making process warrant setting aside the decision and remanding the matter to the agency, and that this conclusion is unlikely to be altered by the filing of additional pages from the administrative record. Both sides agree that the matter needs further consideration by the agency. Further delay is not in the interests of any of the participants.

deliberations, should consider plaintiffs' request to study the remains.

I am concerned, however, that this remand will not be productive unless the Corps carefully scrutinizes the arguments asserted by plaintiffs. In its briefs, defendants categorically dismissed the possibility that plaintiffs might have a First Amendment right to study the remains. Although I do not decide this question today, the issue warrants greater consideration than the Corps has given to it thus far.

■■■ The First Amendment is not limited to "speech" *per se*. It protects both the right to send and also to *receive* information.[15] Defendants acknowledge that the First Amendment limits the government's power to suppress knowledge by removing books from a library, but argue that the government has no affirmative obligation to facilitate the dissemination of knowledge by writing and publishing books. That misconstrues plaintiffs' argument.

Plaintiffs' contention is that to the trained eye the skeletal remains *are* analogous to a book that they can read, a history written in bone instead of on paper, just as the history of a region may be "read" by observing layers of rock or ice, or the rings of a tree. Plaintiffs are not asking the government to conduct the tests and publish the results. Plaintiffs simply want the government to step aside and permit them to "read that book" by conducting their own tests. A closer analogy would be a lawsuit brought by scholars seeking access to the Nixon tapes or presidential papers, or the Pentagon Papers, so the scholars may conduct research and publish their own findings.

In *Griswold*, the Court observed that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." 381 U.S. at 482, 85 S.Ct. at 1680. Similarly, in *First National Bank of Boston*, the Court observed that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." 435 U.S. at 784, 98 S.Ct. at 1420. In *Richmond Newspapers*, Justice Stevens, in a concurring opinion, hailed this decision as a "watershed" because "[t]oday ... for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of

---

**15.** *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (right of consumers to obtain information regarding the prices of prescription drugs at area pharmacies); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576, 582–83, 100 S.Ct. 2814, 2826–27, 2830–31, 65 L.Ed.2d 973 (1980) (right to information about criminal trials); *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (to justify statute prohibiting acceptance of honoraria by government employees, government would have to overcome First Amendment rights of both speakers and their potential audience); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 775, 92 S.Ct. 2576, 2581–82, 2588, 33 L.Ed.2d 683 (1972) (acknowledging existence of right); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978) (corporate political speech); *Bell v. Wolfish*, 441 U.S. 520, 551–52, 99 S.Ct. 1861, 1880–81, 60 L.Ed.2d 447 (1979) (right of inmates to receive information); *Martin v. Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943) (invalidating ordinance forbidding distribution of circulars, on grounds it infringed both the rights of the circulator to disseminate his or her message, and also the rights of the recipient to decide whether he wishes to receive this information); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (right to receive political publications sent from abroad); *Stanley v. Georgia*, 394 U.S. 557, 564–65, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542 (1969) (right to possess pornography); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371 (1969) ("the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences ... may not constitutionally be abridged either by Congress or by the FCC"); *Brandenburg v. Ohio*, 395 U.S. 444, 448, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (information about the views of the Ku Klux Klan); *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) (information about contraceptives); *Board of Education, Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (right of students to read books deemed "vulgar" or "anti-American" by Board of Education); *Terminal–Hudson Electronics, Inc. of California v. Department of Consumer Affairs*, 407 F.Supp. 1075, 1079–80 (C.D.Cal.1975) (information regarding price of eyeglasses), *vacated on other grounds*, 426 U.S. 916, 96 S.Ct. 2619, 49 L.Ed.2d 370 (1976).

speech and of the press protected by the First Amendment." 448 U.S. at 584, 100 S.Ct. at 2831 (Stevens, J., concurring). In that same case, Justice Brennan opined that the Court's prior decisions on this topic hold "only that any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality.... These cases neither comprehensively nor absolutely deny that public access to information may at times be implied by the First Amendment and the principles which animate it." *Id.,* 448 U.S. at 586, 100 S.Ct. at 2832 (Brennan, J., concurring).

Assuming it exists, the full scope of such a constitutional right has yet to be explored. The passage of laws such as the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the various open meeting laws that guarantee access to meetings of legislative bodies, *e.g.,* 5 U.S.C. § 552b, and their state law counterparts, has largely stunted the development of this area of constitutional law by establishing a statutory framework that governs most access claims. However, the issue still surfaces occasionally. *See, e.g., Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1317–18, 55 L.Ed.2d 570 (1978) (rejecting media request for copies of tapes, in part because the contents of the tapes had already been given wide publicity by all elements of the media, and thus there was "no question of a truncated flow of information to the public"); *Nixon v. Administrator of General Services,* 433 U.S. 425, 452–53, 97 S.Ct. 2777, 2794–95, 53 L.Ed.2d 867 (1977) (acknowledging importance of preserving presidential papers in order to ensure an accurate and complete historical record, and to protect the "American people's ability to reconstruct and come to terms with their history"); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (acknowledging right of access to criminal trial); *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (denying television station's request to film conditions inside prison, in part because there were adequate alternative means for gathering the same information without compelling the prison to allow television stations access to a prison) [16]; *Oregonian Publishing Co. v. United States District Court,* 920 F.2d 1462, 1467 (9th Cir.1990) (request by newspaper for access to sealed plea agreement); *EEOC v. Erection Co., Inc.,* 900 F.2d 168 (9th Cir.1990) (request by EEOC to unseal consent decree); *Valley Broadcasting Co. v. United States District Court,* 798 F.2d 1289 (9th Cir.1986) (request by television station to copy audio and videotapes admitted into evidence in criminal trial); *Associated Press v. United States District Court,* 705 F.2d 1143, 1145 (9th Cir. 1983) (right of access to sealed documents in criminal action); *Harding v. United States Figure Skating Ass'n,* 851 F.Supp. 1476 (D.Or.1994) (motion by intervenor newspaper to unseal exhibits filed in civil proceeding brought to halt disciplinary hearing against figure skater).[17]

**16.** Defendants' briefs rely heavily on dictum in *Houchins* that "[t]his Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Houchins,* 438 U.S. at 9, 98 S.Ct. at 2593–94. However, that plurality opinion had the support of only three of the nine justices (Burger, Rehnquist, and White). Three other justices vigorously dissented, declaring that "[a]n official prison policy of concealing ... knowledge from the public by arbitrarily cutting off the flow of information at its source abridges the freedom of speech and of the press protected by the First and Fourteenth Amendments to the Constitution." *Id.,* 438 U.S. at 38, 98 S.Ct. at 2609 (Stevens, Brennan, and Powell dissenting). Two justices (Marshall and Blackmun) abstained. Justice Stewart concurred only in the judgment. *Id.* at 16–17, 98 S.Ct. at 2597–98. Consequently, the dictum relied upon by defendants has little precedential value. In any event, plaintiffs do not assert a right of access "to all sources of information within government control" but only to these particular remains.

**17.** Although plaintiffs are not "media," if such a constitutional right exists it would not necessarily be limited to the press. The news media often are given access to certain proceedings because capacity is limited, and the media serve as representatives of the public who then disseminate the information to the public at large. Plaintiffs have asserted an intent to do the same. Moreover, as a practical matter, plaintiffs could simply contract to write an article for a scientific journal or newspaper and thereby qualify as "media" representatives.

**648**

Assuming, *arguendo*, that there is a First Amendment right for researchers to study materials in the possession or control of the federal government, of necessity there would have to be some limits upon its exercise. Otherwise, every conspiracy buff could assert a constitutional right to exhume the graves of Presidents Kennedy and Lincoln, or to sift through President Clinton's trash. Privacy rights, property rights, and national security would be among the obvious concerns. *See Richmond Newspapers,* 448 U.S. at 586, 100 S.Ct. at 2832 (Brennan, J., concurring) ("any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality.") Some courts also have expressed concern that almost any forbidden conduct potentially can be cast in the form of a First Amendment right to gather knowledge, *e.g.,* the right to smoke marijuana to gather knowledge about its effects. *Cf. Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1441 (9th Cir.1996) (declining to recognize First Amendment right to travel to Cuba to gather first-hand information about conditions there in defiance of government embargo on travel.)

▇▇▇ A further concern is how such a constitutional right would interact with FOIA, NAGPRA, and other statutes. This court would be wary of recognizing a vehicle for circumventing the procedures and limitations that Congress has expressly established. *Cf. Nixon,* 435 U.S. at 603, 98 S.Ct. at 1314–15 (existence of Presidential Recordings Act, which established procedures for screening and releasing presidential tapes and documents, counseled against recognizing an independent common law or First Amendment right for media access to those items). Moreover, even assuming that plaintiffs have some First Amendment rights, the court also would have to consider any countervailing rights. In addition, Congress has "extraordinarily broad" authority with respect to legislation pertaining to Indians in general, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978), and regarding the fulfillment of federal trust obligations to the Tribes in particular. *See, e.g., Morton v. Mancari,* 417

U.S. 535, 551–55, 94 S.Ct. 2474, 2483–85, 41 L.Ed.2d 290 (1974); *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 764–65, 105 S.Ct. 2399, 2402–03, 85 L.Ed.2d 753 (1985); *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 253, 105 S.Ct. 1245, 1258, 1261, 84 L.Ed.2d 169 (1985); *United States v. Wheeler,* 435 U.S. 313, 319, 98 S.Ct. 1079, 1083–84, 55 L.Ed.2d 303 (1978) ("Congress has plenary authority to legislate for the Indian tribes in all matters.") However, although "[t]he power of Congress over Indian affairs may be of a plenary nature ... it is not absolute" and such legislation may still be reviewed for compliance with the United States Constitution. *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 83–84, 97 S.Ct. 911, 918–19, 51 L.Ed.2d 173 (1977).

Again, I do not decide today that there is (or is not) a First Amendment right for scholars to have access to primary research materials that are in the possession and control of the federal government, or the parameters of such a right if it does exist. I suggest only that plaintiffs' arguments are not frivolous, and the issue merits more serious consideration on remand than it received in defendants' briefs.

**Plaintiffs' Equal Protection Claims:**

Both sets of plaintiffs have asserted claims regarding the constitutionality of NAGPRA, its enabling regulations, and the actions taken thereunder. If I understand their allegations correctly, the *Asatru* plaintiffs contend that they are being discriminated against because the NAGPRA regulations permit only an Indian tribe to file a claim for the remains, notwithstanding that non-Indians (i.e., the *Asatru* plaintiffs) may have a closer relationship to the remains.

▇▇▇ I have more difficulty understanding the contentions of the *Bonnichsen* plaintiffs on this issue. At oral argument, they claimed to have been discriminated against on account of their race, *i.e.,* because they were not Native American. Assuming, for the moment, that for purposes of NAGPRA Native American is a "race," as opposed to a political status, *cf. Morton,* 417 U.S. at 553–54, 94 S.Ct. at 2484–85, I fail to comprehend how plaintiffs are being treated differently

merely because they are not Native American. There is nothing in the record to suggest that a Native American archaeologist would be permitted access to the remains, but a Caucasian archaeologist would not. The *amicus* tribes object to anyone studying these remains, regardless of race or tribal affiliation.

■ To the extent the *Bonnichsen* plaintiffs contend that NAGPRA is unconstitutional because it applies only to Native American remains and cultural objects, I question whether the scientists can establish that Congress lacked an adequate justification for the distinction. The court is not aware of any significant market in cultural objects and remains stolen from predominantly Caucasian graveyards in the United States, or of museums exhibiting and cataloguing thousands of Caucasian skeletons, or of any parallel to the "pot-hunters" who vandalize and desecrate Indian graves. *See* Trope and Echo–Hawk, The *Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L. J. 35 (1992) (detailing some of the abuses that led to the enactment of NAGPRA).[18] The legislative history of NAGPRA also contains extensive documentation of the abuses that led to the enactment of this law. *See, generally, Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects: Hearings on H.R. 1381, H.R. 1646, and H.R. 5237 before the House Committee on Interior and Insular Affairs*, 101st Cong., 2d Sess. (1990); *Native American Grave and Burial Protection Act: Hearing on S. 1021 and S.1980 before the Senate Select Committee on Indian Affairs*, 101st Cong., 2d Sess. (1990).

Congress reasonably could have concluded that state and local laws against abusing a corpse, vandalism, and grave-robbing were adequate to protect most modern cemeteries, but that special measures were required to address the unique problem of the theft and desecration of Native American cultural objects and remains. *Id. See also* Hunt, *Illegal Trafficking in Native American Human Remains and Cultural Items: A New Protection Tool,* Ariz. St. L. J. 135 (1992). Moreover, NAGPRA applies to remains and objects discovered on federal lands,[19] which provides Congress with a direct interest. In addition, Congress has a special obligation to legislate for the benefit of Native Americans. *See Morton,* 417 U.S. at 554–55, 94 S.Ct. at 2484–85.

I do not make a final ruling on these claims today. Plaintiffs may pursue them on remand, if they choose, and the Corps should consider plaintiffs' arguments in that regard. However, the *Bonnichsen* plaintiffs will have an uphill battle to convince me that there is any merit to those contentions. At a minimum, plaintiffs must more precisely identify the alleged discrimination, how they have been injured by that discrimination, and why Congress may not enact such legislation (or why the NAGPRA regulations are unconstitutional.) Plaintiffs must also establish any record necessary to support such contentions.

A final issue is the extent to which the equal protection arguments must be addressed by the agency on remand. There is some doubt whether an administrative agency has the authority to decide the constitutionality of a statute or regulation. *See, e.g., The Authority of Administrative Agencies to Consider the Constitutionality of Statutes,* 90

18. According to Trope and Echo–Hawk, prior to the passage of NAGPRA the Smithsonian Institute alone had approximately 18,500 Native American skeletons in its collection, *id,* at 54, the Tennessee Valley Authority possessed approximately 10,000 Native American skeletons, *id.* at 42 n. 29, and estimates of the number of Native American skeletons in museums and private collections ranged from 100,000 up to two million. *Id.* at 39 n. 12. Trope and Echo–Hawk also describe some of the gruesome methods that were used to obtain Indian corpses and funerary items for these collections. *Id.* at 40–42.

19. The statute also applies to objects held by museums that receive federal funding. 25 U.S.C. § 3001(8). In addition, the criminal provisions of NAGPRA may apply to illicit trafficking in certain Native American cultural items regardless of where the item originally was found. *See* Hunt, *Illegal Trafficking in Native American Human Remains and Cultural Items,* 24 Ariz. St. L. J. at 143 ("NAGPRA confers federal jurisdiction over certain items, wherever they are found.").

Harv. L. Rev. 1682 (1977). It often is presumed that agencies do not have such power. *Id. See also Cooper v. Eugene School District No. 4J*, 301 Or. 358, 363–65, 723 P.2d 298 (1986) (reviewing authorities); *Riggin v. Office of Senate Fair Employment Practices*, 61 F.3d 1563, 1569–70 (Fed.Cir.1995).[20]

In recent years, the traditional doctrine—that an agency has no authority to declare a statute or regulation unconstitutional—has come under attack. *See, e.g., The Authority of Administrative Agencies to Consider the Constitutionality of Statutes*, 90 Harv. L. Rev. 1682 (suggesting the rule be reconsidered.) The Oregon Supreme Court has rejected the doctrine and held that Oregon administrative agencies do have the power to declare statutes and rules unconstitutional, although it is an authority to be exercised infrequently and always with care. *Nutbrown v. Munn*, 311 Or. 328, 346, 811 P.2d 131 (1991); *Cooper*, 301 Or. at 365, 723 P.2d 298. The Oregon court reasoned that all state officials—not just the judiciary—swear an oath of allegiance to the constitution and are bound to uphold it. *Cooper*, 301 Or. at 364 n.7, 723 P.2d 298. The court also drew a distinction between requiring a litigant to present his constitutional arguments to the agency versus permitting the agency to consider those arguments if the litigant voluntarily chose to present them at this stage in the proceedings. *Id.* at 364, 723 P.2d 298.

A recent Supreme Court decision also casts some doubt upon the traditional rule. In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994), the issue was whether the federal courts had jurisdiction over a pre-enforcement challenge to an order issued by the Mine Safety and Health Administration. After disposing of the other arguments, the Court observed that:

> As for petitioner's constitutional claim, we agree that "adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *This rule is not mandatory, however ...*

*Id.* at 215, 114 S.Ct. at 780 (internal citations and punctuation omitted). The Court did not explain how a jurisdictional rule could be "not mandatory," but the clear implication is that the rule is not the result of any inherent constitutional limitation upon the powers of administrative agencies but rather is a prudential limitation that in some circumstances may be relaxed or waived. *Cf. Warth*, 422 U.S. at 498, 95 S.Ct. at 2205 (the question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.") Indeed, the *Thunder Basin* Court noted that the Federal Mine Safety and Health Commission had "addressed constitutional questions in previous enforcement proceedings," including

---

**20.** The issue sometimes arises in the context of whether judicial review of agency action is foreclosed entirely; the courts have held that where the claim presents constitutional issues the right to judicial review is presumed notwithstanding that the matter has otherwise been committed to an agency or there is no express right to judicial review. *See Califano v. Sanders* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977) (observing that "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions.")

In other cases, the issue of an agency's authority to make constitutional pronouncements arose in the context of exhaustion of remedies, i.e., whether the plaintiff had to first present his constitutional claims to the agency before seeking judicial review. *Cooper*, 301 Or. at 363, 723 P.2d 298. Typically the courts excused the failure to exhaust remedies and permitted immedi-

ate judicial review. *United States v. Bozarov*, 974 F.2d 1037, 1040 (9th Cir.1992) (excusing failure to exhaust remedies because "raising a constitutional challenge before the agency would have been a futile exercise because an agency has no authority to declare its governing statute unconstitutional," citing *Califano* ); *Reid v. Engen*, 765 F.2d 1457, 1461 (9th Cir.1985) (also relying on *Califano*, and concluding that the court should address the constitutional arguments even though they had not been raised during the administrative hearing). An alternative explanation for these decisions is that a challenge to the constitutionality of a statute typically presents a purely legal question that requires little or no factual development and does not implicate the agency's special expertise or disrupt the agency's implementation of the statutory scheme; in the typical case there may not be any compelling reason to require an initial review by the agency as opposed to direct review by a court.

vagueness, equal protection, and due process. *Id.*[21]

Even if the agency cannot directly declare a statute unconstitutional, there is authority that an agency may consider constitutional issues in construing and applying a statute or regulation. *See Ohio Civil Rights Commission v. Dayton Christian Schools,* 477 U.S. 619, 629, 106 S.Ct. 2718, 2723–24, 91 L.Ed.2d 512 (1986) ("it would seem an unusual doctrine ... to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles"); *Fieger v. Thomas,* 74 F.3d 740, 746–48 (6th Cir.1996) (agency adjudicating contested case may have authority to declare disciplinary rule unconstitutional, or could refuse to enforce rule or perhaps narrowly construe it to avoid violating constitutional rights); *Riggin,* 61 F.3d at 1570 (agency is not precluded from addressing constitutional questions that arise in the course of its deliberations, such as whether the First Amendment, or the Speech or Debate Clause, provides a complete defense to an employment discrimination claim; "The fact that those defenses are constitutionally based would not disable the board from fulfilling its responsibility to decide the statutory claim presented to it").[22]

**21.** A recent Ninth Circuit decision also bears upon this issue. In *Grossman v. City of Portland,* 33 F.3d 1200 (9th Cir.1994), the plaintiff was arrested for demonstrating in a public park without a permit. The arresting officer argued that he was entitled to summary judgment so long as the allegedly unconstitutional action consisted solely of the enforcement of a duly enacted city ordinance. The Circuit disagreed. The panel cited the Holocaust and the My Lai massacre as examples of why a government official should not automatically be entitled to immunity simply because the official was enforcing policies or orders promulgated by those with superior authority. "Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity." *Id.* at 1209. If *Grossman* is correct, then there may be circumstances under which members of the executive branch have both the authority and a duty to refuse to enforce a law or order that is patently unconstitutional, although such authority—if it exists—must be "exercised infrequently, and always with care." *Nutbrown,* 311 Or. at 346, 811 P.2d 131.

**22.** In fact, agencies routinely consider constitutional issues in the course of performing their

On remand, I will neither require—nor forbid—the Corps to consider plaintiffs' equal protection challenges to NAGPRA and to the implementing regulations.[23] However, I will direct plaintiffs to present to the agency all arguments that plaintiffs intend to assert in this case, and to make any record below that is needed to support those contentions. The Corps may address the equal protection issue to the extent it believes it has the authority to do so. Even if the Corps declines to address the issue, I believe this procedure will help to simplify this case by identifying and airing all issues at one time, and by creating a single record for review instead of making a second record in this court.

**Issues to be Considered on Remand:**

In reaching its decision on the ultimate disposition of the remains in question, and on whether to grant plaintiffs' request for permission to study the remains, the Corps should consider, *inter alia,* the following issues:

(a) Whether these remains are subject to NAGPRA, and why (or why not);

(b) What is meant by terms such as "Native American" and "indigenous" in the context of NAGPRA and the facts of this case;[24]

duties, *e.g.,* whether a proposed action would constitute a "taking," or infringes upon First Amendment rights, or what steps the agency must take to provide constitutional due process to persons impacted by the proposed agency action.

**23.** Arguably, there is a difference between an agency declaring a statute unconstitutional versus voiding a regulation. The regulation was not enacted by Congress, and therefore is not entitled to as great a presumption of constitutionality as is accorded to statutes.

**24.** 25 U.S.C. § 3002 applies only to "Native American human remains." NAGPRA defines the term "Native American" to mean "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9). Perhaps Congress had a specific definition in mind. Otherwise, if we assume that Congress intended to use the ordinary meaning of the word, my dictionary defines "indigenous" as "occurring or living naturally in an area; not introduced; native." *American Heritage Dictionary of the English Language* (New College Ed.)

It is not easy to apply the concept of "indigenous" to remains as ancient as those at issue

(c) Whether, if there was more than one wave of ancient migration to the Americas, or if there were sub-populations of early Americans, NAGPRA applies to remains or cultural objects from a population that failed to survive [25] and is not directly related to modern Native Americans;

(d) Whether NAGPRA requires (either expressly or implicitly) a *biological* connection between the remains and a contemporary Native American tribe;

here, at least given the present state of knowledge regarding the origins of humanity in the Americas. Indian legends often recount that their ancestors arose from the earth, or have always occupied this continent, which truly would be "indigenous." *Cf.* Confederated Tribes of the Umatilla Indian Reservation, *Position Paper* (COE 0291–292) ("From our oral histories, we know that our people have been part of this land since the beginning of time. We do not believe that our people migrated here from another continent, as the scientists do.") However, even assuming the ancestors of present day Native Americans have always been here, as the *amici* contend, that in itself does not preclude the possibility that non-Indians could also have been present in the Americas at some earlier date. For that reason, the age of the remains is not, by itself, conclusive proof that these remains are related to contemporary Native Americans.

On the other hand, conventional scientific theory is that modern Native Americans are descended from immigrants who came to the Americas from other continents. If that is true, then were these original immigrants (who were born elsewhere) "indigenous"? Were their children (born here of immigrant parents) "indigenous"? The analysis is further complicated if there was more than one wave of ancient immigration to the Americas, or off-shoots from the primary group(s). If there were sub-populations whose members survived for a time in North America—perhaps hundreds or even thousands of years—but eventually became evolutionary "dead ends," *i.e.*, all descendants of the group eventually died, leaving no one who today is directly descended from them, would a member of such an extinct sub-population be considered "indigenous"? Would they be considered "Native American"? It is essential to define what is meant by "indigenous" and "Native American" for purposes of NAGPRA.

The reference in § 3001(9) to a "culture that is indigenous to the United States" may provide an alternative to the task of establishing that the remains are linked to a people who are biologically "indigenous" to the United States. However, there appears to be little evidence in the record regarding the cultural affiliation of the man whose remains were found.

(e) Whether there has to be any *cultural* affiliation between the remains and a contemporary Native American tribe—and if yes, how that affiliation is established if no cultural objects are found with the remains; [26]

(f) The level of certainty required to establish such a biological or cultural affiliation, e.g., possible, probable, clear and convincing, etc.; [27]

(g) Whether any scientific studies are needed before the Corps can determine whether these particular remains are subject

---

**25.** I am referring here to sub-populations that might have become extinct thousands of years ago. That issue must be distinguished from a separate problem regarding the disposition of remains from tribes that became extinct only recently. The latter concern was raised by Rep. Bennett during the committee hearings on NAGPRA. *See Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects: Hearings on H.R. 1381, H.R. 1646, and H.R. 5237 before the House Conmmittee on Interior and Insular Affairs*, 101st Cong., 2d Sess. 130 (1990).

**26.** A projectile point was found embedded in the remains, which may have led to the man's death. Defendants have suggested that the point was of a type formerly used by Native Americans, and cite this as proof that the man was an ancestor of today's Native Americans. They may be right. However, this also could be seen as proof that the man was *not* of Native American ancestry, but was part of a competing group—which might tend to explain how he ended up dead with a spear embedded in his side. His group might have lost the competition, while the projectile makers survived and gave birth to succeeding generations. I express no opinion as to which historical view, if either, is correct. My point is simply that it is not enough to take one fact out of context and use it to support a pre-determined hypothesis. On remand, the Corps must critically examine all of the evidence in the record as a whole, and make specific findings that are supported by reliable evidence.

During oral argument, the Corps also asserted that the remains "were found in a known burial location for Native American remains," (June 2 tr. at 13), and cited this as evidence that the remains were Native American. Plaintiffs dispute that assertion. Either way, it is unclear from the record whether there is any evidence that the remains were *intentionally* buried at this location, or if the man simply died along the river bank and then was covered by sediment from the floods that were common along the Columbia River before it was dammed.

**27.** *See, e.g.,* 43 C.F.R. § 10.14(f).

to NAGPRA,[28] and if so, whether such studies are legally permissible;[29]

(h) Whether there is evidence of a link, either biological or cultural, between the remains and a modern Native American tribe or to any other ethnic or cultural group including (but not limited to) those of Europe, Asia, and the Pacific islands;

(i) Whether the "study" provisions of 25 U.S.C. § 3005(b) are limited to objects that

---

**28.** The record suggests that the preliminary tests and studies were never completed. If so, the agency may be unable to determine whether these remains are Native American without performing at least· some tests and examinations. Among other things, the Corps may want to ensure that the remains really are over 9000 years old. *See* Aff. of James Chatters ¶ 6 ("The UC Riverside date has not been confirmed by testing at another laboratory.") The Corps may also want to determine whether there are any tests (*e.g.,* DNA tests) that might establish a link (or the lack thereof) to a modern Native American tribe or to any other ethnic or cultural group. The court observes that DNA tests are now being used to either establish or to exclude paternity, and to positively identify human remains that have been badly disfigured in accidents so that the remains can be returned to the correct family for burial.

**29.** This issue was addressed at some length in *Na Iwi,* 894 F.Supp. 1397. After reviewing the text of the statute and the legislative history, the district court concluded that:

> Examinations done for the purpose of accurately identifying cultural affiliation or ethnicity are permissible because they further the overall purpose of NAGPRA, proper repatriation of remains and other cultural items.

*Id.* at 1415. The court concluded that Section 3003(b)(2) does not preclude the further scientific study that is required to accurately inventory the remains pursuant to NAGPRA; "Congress would not require accurate inventories under NAGPRA and then deny museums and federal agencies the necessary tools to comply effectively with that specific requirement." *Id.* at 1417. The examinations at issue in *Na Iwi* are described as "standard physical anthropology techniques." *Id.* at 1403. No DNA analyses were performed. *Id.* "[M]ore extensive metric and nonmetric analyses" were performed on four sets of remains where "there was a definite question as to cultural affiliation/ethnicity of the remains." *Id.* at 1403 n. 3.

The procedural posture of *Na Iwi.* differs from the instant case. In *Na Iwi,* the lawsuit was filed after the museum had already performed the studies in question. The plaintiffs sought a declaration that the studies had been conducted in violation of NAGPRA, and also sought to suppress publication of the results of those studies. *Id.* at 1404. The court ruled against the plaintiffs. *Id.* at 1417–18. In addition, the remains in question were already in the custody of the museum and therefore were subject to the inventory and repatriation provisions of 25 U.S.C. § 3005. The remains at issue here were discovered after the effective date of NAGPRA. That may (or may not) be a significant distinction. In either case, the ultimate objective is to determine whether the remains are subject to NAGPRA and, if they are, to whom the remains should be repatriated.

The *Na Iwi* court also cited a report, prepared by the Congressional Budget Office ("CBO") for the committee that was drafting NAGPRA. The CBO report included an estimate of the costs to implement the bill. It assumed that "extensive studies" would be required to determine the origin of some remains. *Na Iwi,* 894 F.Supp. at 1415 (citing S.Rep. No. 473, 101st Cong., 2d Sess. 19 (1990).) The CBO report is reprinted at 1990 U.S.C.C.A.N. 4367, 4380–81. Other exhibits in NAGPRA's legislative history also explore the estimated cost of the procedures that might be required to properly identify and determine the origin of certain remains. That suggests a recognition that some examination and testing may be required to inventory museum holdings and determine the likely origins of each item and to whom it should be repatriated.

Although a broad spectrum of views were presented during the congressional hearings, it does not appear that the primary purpose of NAGPRA was to forbid scientific study entirely. Rather, the legislative history suggests that NAGPRA's primary focus was on (1) repatriating the hundreds of thousands of Native American remains and cultural items that were stored in museum and agency warehouses, or were on display as exhibits, (2) with limited exceptions, prohibiting the intentional excavation of Native American graves and cultural items, and (3) suppressing the trafficking in Native American remains and artifacts.

Although not pleased by the idea of scientific studies being conducted on remains, most witnesses who testified at the Congressional hearings on NAGPRA expressed considerably more outrage with the improper means by which those remains had been acquired, the disrespect with which the remains had been treated, the failure to consult Native Americans regarding the study or disposition of these human remains and cultural artifacts, and the fact that the remains had been stored in vast permanent collections long after any valid scientific research had been completed. *See, generally, Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects: Hearings on H.R. 1381, H.R. 1646, and H.R. 5237 before the House Committee on Interior and Insular Affairs,* 101st Cong., 2d Sess. (1990); *Native American Grave and Burial Protection Act: Hearing on S. 1021 and S.1980 before the Senate Select Committee on Indian Affairs,* 101st Cong., 2d Sess. (1990).

were in the possession or control of a federal agency or museum prior to November 16, 1990;[30]

(j) Whether there is any other law, *e.g.,* the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. § 470aa *et seq.,* or any other section of NAGPRA such as 25 U.S.C. § 3002(c) or § 3003(b)(2), that either permits or forbids scientific study of these remains;

(k) Whether scientific study and repatriation of the remains are mutually exclusive, or if both objectives can be accommodated;

(*l*) What law controls if the remains are not subject to NAGPRA;

(m) What happens to the remains if no existing tribe can establish a cultural affiliation;

(n) Whether plaintiffs have a right (under the First Amendment or otherwise) to study the remains;

(o) Whether there is any merit to the contention of the *Asatru* plaintiffs that non-Indians should be permitted to file a claim to the remains, or any merit to the equal protection arguments asserted by the plaintiffs (if the Corps decides it has authority to address that issue);

(p) What role, if any, the NAGPRA Review Committee should play in resolving the issues presented by this case; and

(q) Whether NAGPRA is silent on important issues raised by this case, and whether Congressional action will be required to clarify the law regarding "culturally unidentifiable ancient remains."[31]

## CONCLUSION

Defendants' motion (# 85 in *Bonnichsen*) for summary judgment is DENIED. The plaintiffs have standing, and the action has not been mooted. The prior decisions by the Corps of Engineers concerning these re-

mains are hereby VACATED (to the extent they have not already been withdrawn by the agency) and the matter is REMANDED to the Corps of Engineers for further consideration.

This action is STAYED pending completion of the administrative proceedings. The court RETAINS JURISDICTION over this matter to ensure the protection of the remains, and the parties' respective interests concerning them, and to address any related problems that may arise on remand. The parties are to provide the court with quarterly status reports (preferably a joint report, but separately if they cannot agree) with the first report due on or before October 1, 1997, and subsequent reports due every three months thereafter until this matter is resolved.

Plaintiffs' motions (# 47 in *Bonnichsen,* and # 23 in *Asatru*) for permission to study the remains while this action is pending are DENIED without prejudice. The government shall retain custody of the remains and may not dispose of them pending resolution of this controversy. The remains shall continue to be stored in a manner that preserves their potential scientific value.

**30.** *Cf Pueblo of San Ildefonso v. Ridlon,* 103 F.3d 936, 939 (10th Cir.1996) (nothing in the express language of § 3005 indicates that repatriation is limited by when or where the object subject to repatriation was found; rather, "repatriation applies to items *presently in* possession of federally-funded museums, *including* items possessed on ... NAGPRA's effective date"; "NAGPRA's express language does not *limit* repatriation to items found *after* November 16, 1990") (emphasis added).

**31.** Arguably there are two distinct issues here: (1) the disposition of remains that clearly are Native American, but cannot be linked to any specific modern tribe, and (2) the disposition of ancient remains that may not be Native American.