**Robson BONNICHSEN; C. Loring Brace; George W. Gill; C. Vance Haynes, Jr.; Richard L. Jantz; Douglas W. Owsley; Dennis J. Stanford; D. Gentry Steele, Plaintiffs–Appellees,**

v.

**UNITED STATES of America; United States Army; United States Army Corps of Engineers; David A. Fastabend; Francis P. McManamon; Edward J. Kertis; Thomas E. White; Gale A. Norton; Craig Manson; Robert B. Flowers; National Park Service; United States Department of the Interior, Defendants–Appellants,**

**Nez Perce Tribe of Idaho; Confederated Tribes of the Umatilla Indian Reservation; Confederated Tribes & Bands of the Yakama Indian Nation; Confederated Tribes of the Colville Reser-**

vation; Society for American Ar-
chaeology; National Congress of
American Indians, Wanapum Band,
Defendants–Intervenors.

Robson Bonnichsen; C. Loring Brace;
George W. Gill; C. Vance Haynes, Jr.;
Richard L. Jantz; Douglas W. Owsley;
Dennis J. Stanford; D. Gentry Steele,
Plaintiffs–Appellees,

v.

United States of America; United States
Army; United States Army Corps of
Engineers; David A. Fastabend;
Francis P. McManamon; Edward J.
Kertis; Thomas E. White; Gale A.
Norton; Craig Manson; Robert B.
Flowers; National Park Service;
United States Department of the Inte-
rior, Defendants,

Nez Perce Tribe of Idaho; Confederated
Tribes of the Umatilla Indian Reser-
vation; Confederated Tribes & Bands
of the Yakama Indian Nation; Con-
federated Tribes of the Colville Reser-
vation, Defendants–Intervenors–Ap-
pellants.

Nos. 02–35994, 02–35996.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 2003.

Filed Feb. 4, 2004.

Amended April 19, 2004.

See also 969 F.Supp. 628.

Ellen J. Durkee, Environment & Natural Resources Division, Department of Justice, Washington, D.C., for the defendants-appellants.

Thomas P. Schlosser and Rob Roy Smith, Morisset, Schlosser, Jozwiak & McGaw, Seattle, WA, Melissa Compobasso, Nespelem, WA, for intervenor-appellant Confederated Tribes of the Colville Reservation.

Naomi Stacy, Pendleton, OR, for intervenor-appellant Confederated Tribes of the Umatilla Indian Reservation.

David J. Cummings, Lapwai, ID, for intervenor-appellant Nez Perce Tribe.

Thomas Zeilman and Tim Weaver, Toppenish, WA, for intervenor-appellant Yakama Nation.

Joseph P. Siofele, Pro Se, Moreno Valley, CA, appellant.

Alan L. Schneider, Paula A. Barran, Barran Liebman, LLP, Portland, OR, for the plaintiffs-appellees.

Bradley K. Baker, Porter, Wright, Morris & Arthur, LLP, Columbus, OH, for the amicus Ohio Archaeological Council.

S. Shawn Stephens, Locke Liddell & Sapp, LLP, Houston, TX; Joe H. Thrash, Assistant Attorney General, Austin, TX, for the amicus Texas Historical Commission.

Walter Echo–Hawk, Native American Rights Fund, Boulder, CO; Jack F. Trope, Association of American Indian Affairs, Rockville, MD, for the amici Association of American Indian Affairs and Morning Star Institute.

Michael J. Fanelli, Covington & Burling, Washington, D.C., for the amicus Society for American Archaeology.

Sherry Hutt, Pro Se, Paradise Valley, AZ, amicus.

Ellis J. Neiburger, Waukegan, IL, for the amicus Ethnic Minority Council of America.

Christopher A. Amato, Albany, NY; Joseph J. Heath, Syracuse, NY, for the amicus Haudenosaunee Standing Committee on Burial Rules and Regulations.

Dr. Andrei Simic, Pro Se, Los Angeles, CA; Dr. Harry Glynn Custred, Jr., Pro Se, Hayward, CA, amici.

Timothy Sandefur, Sacramento, CA, for the amicus Pacific Legal Foundation.

Dr. Ives Goddard, Pro Se, Washington, D.C.; Dr. William Shipley, Pro Se, Santa Cruz, CA, amici.

Before: ALDISERT,[*] GRABER, and GOULD, Circuit Judges.

## ORDER

The opinion published at 357 F.3d 962 (9th Cir.2004) filed on February 4, 2004 is amended so that footnote 20 should read:

In so holding, we necessarily determine that no reasonable person could conclude on this record that Kennewick Man is "Native American" under NAG-PRA. See *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (holding that under the substantial evidence standard the reviewing court "must decide whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion").

With this amendment, the Petition for Rehearing is DENIED.

The full court has been advised of the Petition for Rehearing En Banc and no judge of the court has requested a vote on the Petition for Rehearing En Banc. Fed. R.App. P. 35. Appellant's Petition for Rehearing En Banc is also DENIED.

No further petition for rehearing or rehearing en banc will be accepted in these cases.

**IT IS SO ORDERED.**

## OPINION

GOULD, Circuit Judge:

This is a case about the ancient human remains of a man who hunted and lived, or at least journeyed, in the Columbia Plateau an estimated 8340 to 9200 years ago, a time predating all recorded history from any place in the world, a time before the oldest cities of our world had been founded, a time so ancient that the pristine and untouched land and the primitive cultures that may have lived on it are not deeply understood by even the most well-informed men and women of our age. Seeking the opportunity of study, a group of scientists as Plaintiffs[1] in this case brought an action against, *inter alia*, the United States Department of the Interior, challenging various Indian tribes'[2] claim to one of the most important American anthropological and archaeological discoveries of the late twentieth century, and challenging the Interior Department's decision honoring the tribes' claim. The discovery that launched this contest was that of a human skeleton, estimated by carbon dating to be 8340 to 9200 years old, known popularly and commonly as "Kennewick Man," but known as "the Ancient One" to

---

[*] The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

[1] Plaintiffs are experts in their respective fields. Plaintiff Bonnichsen is Director of the Center for the Study of the First Americans at Oregon State University. Plaintiff Brace is Curator of Biological Anthropology at the University of Michigan Museum of Anthropology. Plaintiffs Gill, Haynes, Jantz, and Steele are anthropology professors. Plaintiff Owsley is division head for physical anthropology at

the Smithsonian Institution's National Museum of Natural History. Plaintiff Stanford is Director of the Smithsonian's Paleo Indian Program.

[2] The Tribal Claimants—present in this appeal as intervenors—are the Confederated Tribes & Bands of the Yakama Indian Nation, the Nez Perce Tribe of Idaho, the Confederated Tribes of the Umatilla Indian Reservation, and the Confederated Tribes of the Colville Reservation.

some American Indians [3] who now inhabit regions in Washington, Idaho, and Oregon, roughly proximate to the site on the Columbia River at Kennewick, Washington, where the bones were found. From the perspective of the scientists Plaintiffs, this skeleton is an irreplaceable source of information about early New World populations that warrants careful scientific inquiry to advance knowledge of distant times. Yet, from the perspective of the intervenor-Indian tribes the skeleton is that of an ancestor who, according to the tribes' religious and social traditions, should be buried immediately without further testing.

Plaintiffs filed this lawsuit seeking to stop the transfer of the skeleton by the government to the tribes for burial, and the district court held in favor of the scientists-Plaintiffs. [4] The Secretary of the Interior and the intervenor-Indian tribes appeal. We have jurisdiction under 28 U.S.C. § 1291 and affirm the judgment of the district court barring the transfer of the skeleton for immediate burial and instead permitting scientific study of the skeleton.

I

In July 1996, teenagers going to a boat race discovered a human skull and bones near the shore of the Columbia River just outside Kennewick, Washington. [5] The remains were found on federal property under the management of the United States Army Corps of Engineers ("Corps") and, at the request of the county coroner, were removed for analysis by an anthropologist, Dr. James Chatters, pursuant to an Archaeological Resources Protection Act of 1979 ("ARPA"), 16 U.S.C. §§ 470aa–470mm, permit. Because of physical features such as the shape of the skull and facial bones, anthropologists at first thought the remains were those of an early European settler. But the anthropologists then found a stone projectile point embedded in the skeleton's upper hip bone. The object's design, when viewed with x-rays and CT scans of the hip, resembled a style that was common before the documented arrival of Europeans in the region. Further study of the remains revealed characteristics unlike those of a European settler, yet also inconsistent with any American Indian remains previously documented in the region. A minute quantity of metacarpal bone was radiocarbon dated. The laboratory estimated the age of the bones to be between 8340 and 9200 years old. [6]

---

3. We use the term "American Indian" because the definition of "Native American," as used in Native American Graves Protection and Repatriation Act, is a disputed issue in this appeal.

4. The district court has issued three published opinions in this case. See Bonnichsen v. United States, 969 F.Supp. 614 (D.Or.1997) (denying Defendants' motion to dismiss based on failure to state a claim and ripeness grounds) (Bonnichsen I); Bonnichsen v. United States, 969 F.Supp. 628 (D.Or.1997) (Bonnichsen II) (denying Defendants' motion for summary judgment and vacating the government's disposition of the Kennewick Man's remains); Bonnichsen v. United States, 217 F.Supp.2d 1116 (D.Or.2002) (Bonnichsen III) (again va-

cating the government's disposition of the Kennewick Man's remains).

5. Our rendition of the facts is adapted from the district court's third published opinion in this case. See Bonnichsen v. United States, 217 F.Supp.2d 1116 (D.Or.2002). No party on appeal disputes the district court's findings of fact, which are supported by the administrative record.

6. Human skeletons this old are rare in the Western Hemisphere, and most found have consisted of only fragmented remains. The record indicates that less than twelve securely dated human crania older than 8000 years have been found in the United States. By contrast, about 90 percent of this skeleton

The skeleton attracted attention because some of its physical features, such as the shape of the face and skull, differed from those of modern American Indians. Many scientists believed the discovery might shed light on the origins of humanity in the Americas. On August 31, 1996, Dr. Douglas Owsley, Division Head for Physical Anthropology at the Smithsonian Institution in Washington, D.C., made arrangements for Dr. Chatters to bring this important find to the Smithsonian's National Museum of Natural History for further study.[7]

Indian tribes from the area of the Columbia River opposed scientific study of the remains on religious and social grounds.[8] Four Indian groups (the "Tribal Claimants") demanded that the remains be turned over to them for immediate burial. The Tribal Claimants based their demand on the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 et seq. The Corps agreed with the Tribal Claimants and, citing NAGPRA, seized the remains on September 10, 1996, shortly before they could be transported to the Smithsonian. The Corps also ordered an immediate halt to DNA testing, which was being done using the remainder of the bone sample that had been submitted earlier for radiocarbon dating. After investigation, the Corps decided to give the remains to the Tribal Claimants for burial. As required by NAGPRA, the Corps published a "Notice of Intent to Repatriate Human Remains" in a local newspaper on September 17, 1996, and September 24, 1996.

The scientists and others, including the Smithsonian Institution, objected to the Corps' decision, arguing that the remains were a rare discovery of national and international significance. In late September and early October 1996, several scientists asked Major General Ernest J. Herrell, Commander of the Corps' North Pacific Division, to allow qualified scientists to study the remains.

---

was recovered in good condition. Dr. Chatters testified in an affidavit: "The Kennewick Man skeleton is virtually intact. It lacks only the sternum and a few small nondiagnostic bones of the hands and the feet. Although some of the ribs and other long bones are fragmented, they can be reconstructed. The skull and the lower jaw are complete and are not deformed. The bones of the skeleton are extremely well preserved, with only minor surface mineralization and little if any evidence of decay."

7. The Smithsonian Institution in Washington, D.C., is the world's largest museum complex, with fourteen museums in the District of Columbia and over 90 affiliate museums. The National Museum of Natural History, part of the Smithsonian Institution, was established in 1910 and "is home to about 185 professional natural history scientists, the largest group of scientists dedicated to the study of the natural and cultural history in the world." National Museum of Natural History Research & Collections Home Page, http://www.mnh.si.edu/rc/.

8. For example, the Tribal Claimants urged that "[w]hen a body goes into the ground, it is meant to stay there until the end of time. When remains are disturbed and remain above the ground, their spirits are at unrest.... To put these spirits at ease, the remains must be returned to the ground as soon as possible." Bonnichsen III, 217 F.Supp.2d at 1121 (quoting Joint Tribal Amici Memorandum (1997) at 4–5). We note that the Ethnic Minority Council of America, in its amicus brief, urges that: "Potential descendants [of Kennewick Man] may not be members of the Joint Tribal Claimants or believe in the expressed 'Indian' religious interpretations made by the political leaders of the tribes." Further, as suggested by amicus Ohio Archaeological Council, in the absence of a conclusive determination of cultural affiliation, the Tribal Claimants cannot establish that permitting Plaintiffs-scientists to study the Kennewick Man's remains offends their religious views or customs.

The scientists did not convince the Corps to permit them to study the remains, and commenced this litigation on October 16, 1996, in the United States District Court for the District of Oregon. In an opinion issued June 27, 1997, the district court [9] denied the Corps' motion for summary judgment, finding that the Corps had "acted before it had all of the evidence," "did not fully consider or resolve certain difficult legal questions," and "assumed facts that proved to be erroneous." *Bonnichsen II*, 969 F.Supp. 628, 645 (D.Or.1997). The district court vacated the Corps' earlier decision on disposition of the remains and remanded the case to the Corps for further proceedings. *Id.* at 644–45. The district court also denied, without prejudice, Plaintiffs' motion to study the remains and directed the Corps to consider, on remand, "whether to grant [P]laintiffs' request [under ARPA] for permission to study the remains." *Id.* at 632, 651.

On March 24, 1998, the Corps and the Secretary of the Interior entered into an agreement that effectively assigned to the Secretary responsibility to decide whether the remains were "Native American" under NAGPRA, and to determine their proper disposition. The Department of the Interior then assumed the role of lead agency on this case.

Almost two years after this matter was remanded, the Secretary's experts began to examine the remains in detail. The experts estimated that Kennewick Man was 5″ 9′ to 5″ 10′ tall, 45 to 50 years of age when he died, and 15 to 20 years old when the projectile point became embedded in his hip. The experts could not determine, from non-destructive examination of the skeleton alone, when Kennewick Man lived. However, analysis of sediment layers where the skeleton was found supported the hypothesis that the remains dated back not less than 7600 years ago and Kennewick Man could have lived more than 9000 years ago (the date indicated by the initial radiocarbon dating of the skeleton). Further study of the sediment was recommended, but the Corps' decision to bury the discovery site in April 1998 prevented completion of those studies.[10]

The experts compared the physical characteristics of the remains—e.g., measurements of the skull, teeth, and bones—with corresponding measurements from other skeletons. They concluded that Kennewick Man's remains were unlike those of any known present-day population, American Indian or otherwise.

The Secretary's experts cautioned, however, that an apparent lack of physical resemblance between the Kennewick Man's remains and present-day American

---

9. The parties agreed that the magistrate judge's determinations would be final and not subject to review by the district court. We refer to the opinions of the magistrate judge as that of the district court.

10. The Corps buried the discovery site of the remains under approximately two million pounds of rubble and dirt, topped with 3700 willow, dogwood, and cottonwood plants. The lengthy administrative record that Defendants filed with the district court documents only a portion of the process by which the decision to bury the site was made. Nevertheless, that record suggested to the district

court that the Corps' primary objective in covering the site was to prevent additional remains or artifacts from being discovered, not to "preserve" the site's archaeological value or to remedy a severe erosion control problem as Defendants represented. *Bonnichsen III*, 217 F.Supp.2d at 1125. Burial of the discovery site hindered efforts to verify the age of Kennewick Man's remains, and effectively ended efforts to determine whether other artifacts are present at the site which might shed light on the relationship between the remains and contemporary American Indians. *Id.* at 1126.

Indians did not completely rule out the possibility that the remains might be biologically ancestral to modern American Indians. Moreover, although Kennewick Man's morphological traits did not closely resemble those of modern American Indian populations, the Secretary's experts noted that Kennewick Man's physical attributes are generally consistent with the very small number of human remains from this period that have been found in North America.

Relying solely on the age of the remains and the fact that the remains were found within the United States, on January 13, 2000, the Secretary pronounced Kennewick Man's remains "Native American" within NAGPRA's meaning. And on September 25, 2000, the Secretary determined that a preponderance of the evidence supported the conclusion that the Kennewick remains were culturally affiliated with present-day Indian tribes. For this reason, the Secretary announced his final decision to award Kennewick Man's remains to a coalition of the Tribal Claimants. The Corps and the Secretary also denied Plaintiffs' request to study the remains.

Plaintiffs filed an amended complaint in the district court challenging the Secretary's decisions. The district court again ruled in Plaintiffs' favor. As pertinent to this appeal, the district court vacated the Secretary's decisions as contrary to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), on the ground that

the Secretary improperly concluded that NAGPRA applies.[11] *Bonnichsen III*, 217 F.Supp.2d at 1138–39. The district court also held that, because NAGPRA did not apply, Plaintiffs should have the opportunity to study Kennewick Man's remains under ARPA. Defendants and the Tribal Claimants appealed, and we stayed the district court's order granting Plaintiffs-scientists' study of the remains pending our decision herein.[12]

## II

■ We first address an issue of jurisdiction. The Tribal Claimants argue that we lack jurisdiction because: (1) Plaintiffs' alleged injuries are not "redressable" by court action, and (2) Plaintiffs lack standing to bring claims alleging violations of NAGPRA because Plaintiffs do not seek to invoke interests within the "zone of interests" protected by NAGPRA.

## A

As a general rule, the three constitutional standing requirements are imposed by the "case" or "controversy" provision of Article III:

(1) that the plaintiff have suffered an "injury in fact" ...; (2) that there be a causal connection between the injury and the conduct complained of ...; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

11. The district court also held that even if NAGPRA applied: (1) the remains were not "culturally affiliated" with the Tribal Claimants; (2) only an individual Indian tribe—not a coalition of Indian tribes—could be a proper claimant under NAGPRA; and (3) the Tribal Claimants' alleged "aboriginal occupation" of the discovery site was not a proper reason to give the Tribal Claimants the remains. *Bonnichsen III*, 217 F.Supp.2d at 1158. Because we conclude *infra* that NAGPRA does not apply to Kennewick Man's remains, we do

not need to reach and we do not review these additional holdings of the district court.

12. An additional appellant, Joseph P. Siofele, argues that Kennewick Man's remains are Polynesian, that Siofele is Kennewick Man's descendant, and that Kennewick Man's remains properly belong to him. Siofele appeals *pro se* from the district court's denial of his untimely motion to intervene. We resolve Siofele's appeal in a separate disposition.

*Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The Tribal Claimants do not dispute that Plaintiffs meet the first two constitutional standing requirements, and we so hold. But the Tribal Claimants argue that Plaintiffs do not meet the third requirement. The Tribal Claimants contend that Plaintiffs cannot show that the alleged injury, losing the opportunity to study Kennewick Man's remains, would be redressed by a favorable court decision because, the Tribal Claimants contend, NAGPRA, not ARPA, applies to this case, precluding redress of Plaintiffs' alleged injury. Stated another way, Defendants' theory is that Plaintiffs' injury is not redressable because Plaintiffs are not entitled to relief.

■ This argument is incorrect. The question in deciding whether a plaintiff's injury is redressable is not whether a *favorable decision* is likely but whether a favorable decision *likely will redress* a plaintiff's injury. *See Bennett,* 520 U.S. at 167, 117 S.Ct. 1154. In deciding whether a plaintiff's injury is redressable, courts assume that plaintiff's claim has legal merit. *See Hall v. Norton,* 266 F.3d 969, 976–77 (9th Cir.2001) ("The purpose of the standing doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will ultimately prevail against the defendant."). Were the rule otherwise, courts would never have jurisdiction to entertain a lawsuit that appeared, at the pleading stage, and before evidence was considered, likely to fail on the merits. Such a rule would be illogical.

Here, if NAGPRA does not apply (as we must assume in determining whether Plaintiffs have standing), ARPA applies, per the district court's ruling. Kennewick Man's remains are of archaeological significance and were collected pursuant to an ARPA permit. Neither Appellant disputes that ARPA gives Plaintiffs the opportunity to study Kennewick Man's remains if NAGPRA does not apply. We conclude that it is likely that Plaintiffs' injury will be redressed by a favorable decision on the NAGPRA issue, and thus Plaintiffs have constitutional standing.

**B**

Second, the Tribal Claimants argue that Plaintiffs lack standing to bring claims alleging violations of NAGPRA because Plaintiffs do not seek to invoke interests within the "zone of interests" that NAGPRA protects. The Tribal Claimants urge that Congress enacted NAGPRA only with the interests of American Indians in mind, so only American Indians or Indian tribes can file suit alleging violations of NAGPRA. We reject this argument.

The "zone of interests" test invoked by the Tribal Claimants is a judge-made "prudential standing requirement," independent of the three immutable constitutional standing requirements of Article III. *See Bennett,* 520 U.S. at 163, 117 S.Ct. 1154. Congress can modify or abrogate the zone of interests test, *see id.,* and Congress did exactly that in NAGPRA's broadly worded "enforcement" section. That statute, 25 U.S.C. § 3013, provides that "[t]he United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter." Section 3013 by its terms broadly confers jurisdiction on the courts to hear "*any action*" brought by "*any person alleging a violation.*" *Id.* (emphasis added).

The Supreme Court has held that such broad statutory language effectively negates the prudential zone of interests test. In *Bennett,* the Court decided "to take the term 'any person' at face value," and held that "any person" could enforce the Endangered Species Act, which provides that "*any person* may commence a civil suit on his own behalf . . . to enjoin any person . . . alleged to be in violation of any provi-

sion of this chapter." 520 U.S. at 165 & n. 2, 117 S.Ct. 1154; 16 U.S.C. § 1540(g). In *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210–11, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Court held that standing was expanded to the full extent permitted under Article III by the Civil Rights Act of 1968. That statute provided, "[a] ny person who claims to have been injured by a discriminatory housing practice" may sue. 42 U.S.C. § 3610(a) (1986 ed.) (emphasis added).

■ Like the statutes at issue in *Bennett* and *Trafficante*, § 3013 of NAGPRA contains the broad "any person" formulation and includes no textual limitation on federal court jurisdiction. Moreover, § 3013 does not contain the more restrictive formulations Congress sometimes uses to limit standing. *See, e.g.*, 15 U.S.C. § 298(b) (authorizing suit only by "competitors, customers, or subsequent purchasers"). We hold that § 3013 does not limit jurisdiction to suits brought by American Indians or Indian tribes. "Any person" means exactly that, and may not be interpreted restrictively to mean only "any American Indian person" or "any Indian Tribe." [13]

■ It is true that Plaintiffs are seeking *to prevent* the Secretary from repatriating human remains, rather than *to compel* the Secretary to repatriate them. But the "any person" formulation applies to all causes of action authorized by § 3013. The formulation applies not only to actions against the Secretary asserting under-enforcement of NAGPRA, but also to actions against the Secretary asserting over-enforcement. *See Bennett*, 520 U.S. at 166, 117 S.Ct. 1154 ("[T]he 'any person' formulation applies to all the causes of action authorized by[the Endangered Species Act] ... not only to actions against the Secretary asserting underenforcement ... but also to actions against the Secretary asserting overenforcement...."). We conclude that we have jurisdiction over Plaintiffs' claims that NAGPRA was violated.[14]

### III

Our review of the Secretary's decision to transfer Kennewick Man to the Tribal

13. The Tribal Claimants rely on an out-of-circuit district court decision, *Idrogo v. United States Army*, 18 F.Supp.2d 25 (D.D.C.1998), for the proposition that non-Indian plaintiffs lack standing to bring lawsuits alleging violations of NAGPRA because they are not within the statute's zone of interests. But *Idrogo* does not stand for this broad proposition and is not persuasive to us in support of the claimed restriction. Rather, *Idrogo* merely held that a particular plaintiff bearing no relation to the Apache warrior Geronimo could not sue for the "return" of Geronimo's remains because that plaintiff did not satisfy the constitutional injury-in-fact requirement. *Id.* at 27. In *Idrogo*, neither the prudential standing requirements nor the zone-of-interests test was at issue. And unlike Plaintiffs here, the *Idrogo* plaintiff had not alleged any interest in studying the remains.

14. Even if NAGPRA did not confer jurisdiction over Plaintiffs' claims, the APA's "gener-

ous review provisions" would confer jurisdiction. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The APA provides a right to judicial review of all "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. The interests Plaintiffs seek to protect are "arguably within the zone of interests to be protected or regulated" by NAGPRA § 3002(a). *See Bennett*, 520 U.S. at 175, 117 S.Ct. 1154 (holding that under an APA claim one looks to substantive statutes to determine whether zone-of-interests test is met). NAGPRA § 3002(a) was not intended merely to benefit American Indians, but rather to strike a balance between the needs of scientists, educators, and historians on the one hand, and American Indians on the other. Plaintiffs' claim that they are victims of a mistaken over-enforcement of § 3002(a) is within the provision's zone of interests.

Claimants is governed by the APA, which instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

NAGPRA vests "ownership or control" of newly discovered Native American human remains in the decedent's lineal descendants or, if lineal descendants cannot be ascertained, in a tribe "affiliated" with the remains. 25 U.S.C. § 3002(a). NAGPRA mandates a two-part analysis. The first inquiry is whether human remains are Native American within the statute's meaning. If the remains *are not* Native American, then NAGPRA does not apply. However, if the remains *are* Native American, then NAGPRA applies, triggering the second inquiry of determining which persons or tribes are most closely affiliated with the remains.

■ The parties dispute whether the remains of Kennewick Man constitute Native American remains within NAGPRA's meaning. NAGPRA defines human remains as "Native American" if the remains are "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9). The text of the relevant statutory clause is written in the present tense ("of, or relating to, a tribe, people, or culture *that is* indigenous"). Thus the statute unambiguously

requires that human remains bear some relationship to a *presently existing* tribe, people, or culture to be considered Native American.

■ It is axiomatic that, in construing a statute, courts generally give words not defined in a statute their "ordinary or natural meaning." *United States v. Alvarez–Sanchez,* 511 U.S. 350, 357, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994); *see also Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (holding that courts "give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import") (internal quotation marks omitted).

In the context of NAGPRA, we conclude that Congress's use of the present tense is significant.[15] The present tense "in general represents present time." R. Pence and D. Emery, A Grammar of Present Day English 262 (2d ed.1963). Congress, by using the phrase "is indigenous" in the present tense, referred to presently existing tribes, peoples, or cultures. We must presume that Congress gave the phrase "is indigenous" its ordinary or natural meaning. *Alvarez–Sanchez,* 511 U.S. at 357, 114 S.Ct. 1599. We conclude that Congress was referring to *presently existing* Indian tribes when it referred to "a tribe, people, or culture *that is* indigenous to the United States." 25 U.S.C. § 3001(9) (emphasis added).[16]

---

**15.** The Supreme Court has found Congress's use of the present tense to be significant when interpreting Congress's intentions. *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 59, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that Congress's use of the present tense in 33 U.S.C. § 1365 meant that citizens could not maintain a suit for past violations of the Clean Water Act) (superceded in irrelevant part by statute). Federal appellate courts have made similar observations. *Medberry v. Butler,* 185 F.3d

1189, 1193 (11th Cir.1999) ("Congress' use of the present tense in [28 U.S.C.] § 1915(g) confirms that a prisoner's allegation that he faced imminent danger sometime in the past is an insufficient basis to allow him to proceed *in forma pauperis* pursuant to the imminent danger exception to the statute"); *Malik v. McGinnis,* 293 F.3d 559, 562 (2d Cir.2002) (same); *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 313 (3d Cir.2001) (same).

**16.** The Secretary argues that "[i]n common parlance, the words 'is' and 'was' are appro-

NAGPRA also protects graves of persons not shown to be of current tribes in that it protects disjunctively remains "of, or relating to" current indigenous tribes. Thus, NAGPRA extends to all remains that relate to a tribe, people, or culture that is indigenous to the United States, *see* 25 U.S.C. § 3001(9) (defining human remains as Native American if they are "of, *or relating to,* a tribe, people, or culture that is indigenous to the United States") (emphasis added).

Our conclusion that NAGPRA's language requires that human remains, to be considered Native American, bear some relationship to a presently existing tribe, people, or culture accords with NAGPRA's purposes. As regards newly discovered human remains, NAGPRA was enacted with two main goals: to respect the burial traditions of modern-day American Indians and to protect the dignity of the human body after death. NAGPRA was intended to benefit modern American Indians by sparing them the indignity and resentment that would be aroused by the despoiling of their ancestors' graves and the study or the display of their ancestors' remains. *See* H.R.Rep. No. 101–877, U.S.Code

Cong. & Admin.News at 4367, 4369 (1990) ("For many years, Indian tribes have attempted to have the remains and funerary objects of *their ancestors returned to them.*") (emphasis added).

Congress's purposes would not be served by requiring the transfer to modern American Indians of human remains that bear no relationship to them. Yet, that would be the result under the Secretary's construction of the statute, which would give Native American status to any remains found within the United States regardless of age and regardless of lack of connection to existing indigenous tribes.[17] The exhumation, study, and display of ancient human remains that are unrelated to modern American Indians was not a target of Congress's aim, nor was it precluded by NAGPRA.

NAGPRA was also intended to protect the dignity of the human body after death by ensuring that Native American graves and remains be treated with respect. *See* S.Rep. No. 101–473, at 6 (1990) ("The Committee believes that human remains must at all times be treated with dignity and respect."); H.R.Rep. No. 101–877,

---

priately used interchangeably when referring to tribes, peoples and cultures that existed in the past but are being spoken of in the present." Gov't Opening Brief at 31. The Secretary offers no support for this assertion, and we decline to accept it as an accurate description of the intent of Congress in this case as we interpret NAGPRA. Our holding is limited to a determination that Congress was referring to *presently existing* Indian tribes when it referred to "a tribe, people, or culture *that is* indigenous to the United States." We do not foreclose the possibility that, in any other statute, Congress's use of the present tense, in the context of a different statute, with different statutory language, structure, and purposes, could implicate a time period other than the present.

**17.** At oral argument, the government urged that its interpretation of remains as Native

American when found within the United States would apply even to remains as old as 100,000 or 150,000 years, close to the dawn of *homo sapiens.* Indeed, the government at oral argument even said that if remains of a mythical first man and woman, an "Adam and Eve," were found in the United States, those remains would be "Native American" under the government's interpretation of NAGPRA. Thus the government's unrestricted interpretation based solely on geography, calling any ancient remains found in the United States "Native American" if they predate the arrival of Europeans has no principle of limitation beyond geography. This does not appear to us to be what Congress had in mind. Nor does the legislative history support NAGPRA coverage of bones of such great antiquity.

U.S.Code Cong. & Admin.News at 4367, 4372 (1990) ("Some Indian representatives testified that the spirits of *their ancestors* would not rest until they are returned to their homeland....") (emphasis added). Congress's purpose is served by requiring the return to modern-day American Indians of human remains that bear some significant relationship to them.

Despite the statute's language and legislative history, the Secretary argues that the district court's interpretation "improperly collapses" NAGPRA's first inquiry (asking *whether* human remains are Native American) into NAGPRA's second inquiry (asking *which* American Indians or Indian tribe bears the closest relationship to Native American remains). The Secretary is mistaken. Though NAGPRA's two inquiries have some commonality in that both focus on the relationship between human remains and present-day Indians, the two inquiries differ significantly. The first inquiry requires only a general finding that remains have a significant relationship to a presently existing "tribe, people, or culture," a relationship that goes beyond features common to all humanity. The second inquiry requires a more specific finding that remains are most closely affiliated to specific lineal descendants or to a specific Indian tribe. The district court's interpretation of NAGPRA preserves the statute's two distinct inquiries. Because the record shows no relationship of Kennewick Man to the Tribal Claimants, the district court was correct in holding that NAGPRA has no application.

■ The Secretary finally argues that, under *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must defer to the Secretary's interpretation of "Native American." The Secretary by regulation has defined "Native American" to mean "of, or relating to, a tribe, people, or culture indigenous to the United States." 43 C.F.R. § 10.2(d). The Secretary's regulation, enacted through notice and comment rulemaking, defines Native American exactly as NAGPRA defines it, with one critical exception: the regulation omits the present-tense phrase "that is." *Compare* 25 U.S.C. § 3001(9) ("*a culture that is indigenous* to the United States") (emphasis added) *with* 43 C.F.R. § 10.2(d) ("*a culture indigenous* to the United States") (emphasis added). We hold, for the reasons discussed above, that NAGPRA's requirement that Native American remains bear some relationship to a *presently existing* tribe, people, or culture is unambiguous, and that the Secretary's contrary interpretation therefore is not owed *Chevron* deference. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.");[18] *see also Wilderness Soc'y v. United States Fish & Wildlife Serv.,* 353 F.3d 1051, 1061 (9th Cir.2003) (en banc) ("If, under these canons, or other traditional means of determining Congress's intentions, we are able to determine that Congress spoke clearly ..., then we may not defer to the[agency's] contrary interpretation."). Moreover, the Secretary's regulation conflicts with NAGPRA's plain language and so is invalid for that reason. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 481, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (holding that *Chevron* deference is due only to a "*reasonable*

---

18. Because this aspect of NAGPRA is unambiguous, we need not resort to the "Indian canon of construction," under which "doubtful expressions" in legislation passed for the benefit of Indian tribes are resolved in favor of the Indians. *See South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986).

interpretation made by the administrator of an agency") (emphasis added) (internal quotation marks omitted); *Pub. Employees Ret. Sys. of Ohio v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself."). Finally, the common maxim of statutory construction that we must give effect, if possible, to every word Congress used is fatal to the Secretary's attempt to amend NAGPRA by removing the phrase "that is." *See Bennett,* 520 U.S. at 173, 117 S.Ct. 1154 ("It is the 'cardinal principle of statutory construction' [that courts must] give effect, if possible, to every clause and word of a statute...."). We hold that, notwithstanding 43 C.F.R. § 10.2(d), NAGPRA requires that human remains bear a significant relationship to a *presently existing* tribe, people, or culture to be considered Native American. The district court did not err in reaching that conclusion.

The requirement that we must give effect, if possible, to every word Congress used supports our holding that human remains must be related to a currently existing tribe to come within NAGPRA's protection. Under the Secretary's view of NAGPRA, all graves and remains of persons, predating European settlers, that are found in the United States would be "Native American," in the sense that they presumptively would be viewed as remains of a deceased from a tribe "indigenous" to the United States, even if the tribe had ceased to exist thousands of years before the remains were found, and even if there was no showing of any relationship of the remains to some existing tribe indigenous to the United States. Such an extreme interpretation, as was urged by the Secretary here, *see supra* note 17, would render superfluous NAGPRA's alternative "relating to" method for establishing remains as "Native American" (i.e., if remains are "of,

*or relating to,* a tribe that is indigenous to the United States"). If accepted, the Secretary's interpretation would mean that the finding of any remains in the United States *in and of itself* would automatically render these remains "Native American." This interpretation would leave no meaning for the "relating to" clause, unless we were to interpret the clause to cover remains found outside the United States. But we cannot conclude that Congress intended an absurd result, for Congress could not be considered to have jurisdiction over disposition of human remains found in some other country. By reading NAGPRA's definition of "Native American" literally, meaning is given to each of its terms. Some remains may be covered because they are remains of a tribe, people, or culture that is indigenous, while other remains may be covered because they are "related to" a currently existing indigenous tribe, people, or culture.

Our analysis is strengthened by contrasting the statutory definition of the adjective "Native American" to the statutory definition of the noun "Native Hawaiian." Under § 3001(9), " 'Native American' means of, or relating to, a tribe, people or culture that is indigenous *to the United States.*" (Emphasis added). Under § 3001(10), " 'Native Hawaiian' means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty *in the area that now constitutes the State of Hawaii.*" (Emphasis added).

The "United States" is a political entity that dates back to 1789. *Owings v. Speed,* 18 U.S. (5 Wheat.) 420, 423, 5 L.Ed. 124 (1820). This term supports that Congress's use of the present tense ("that *is* indigenous") referred to tribes, peoples, and cultures that exist in modern times, not to those that may have existed thousands of years ago but who do not exist

now. By contrast, when Congress chose to harken back to earlier times, it described a geographic location ("the area that now constitutes the State of Hawaii") rather than a political entity ("the United States").

Our conclusion that NAGPRA requires human remains to bear some relationship to a presently existing tribe, people, or culture to be considered "Native American" is also reinforced by how NAGPRA defines "sacred objects." NAGPRA defines "sacred objects" as "specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions *by their present day adherents.*" 25 U.S.C. § 3001(3)(C) (emphasis added). A literal reading of this definition reveals that any artifact to be deemed a "sacred object" must be connected to the practice of an American Indian religion by *present-day* peoples. This reading is consistent with our reading of "Native American"; that is, just as there must be a relationship between an artifact and a presently existing peoples for the artifact to be a "sacred object" under NAGPRA, there must be a relationship between a set of remains and a presently existing tribe, people, or culture for those remains to be "Native American" under NAGPRA.

Although NAGPRA does not specify precisely what *kind* of a relationship or precisely *how strong* a relationship ancient human remains must bear to modern Indian groups to qualify as Native American, NAGPRA's legislative history provides some guidance on what type of relationship may suffice. The House Committee on Interior and Insular Affairs emphasized in its report on NAGPRA that the statute was being enacted with modern-day American Indians' identifiable *ancestors* in mind. *See, e.g.,* H.R.Rep. No. 101–877, U.S.Code Cong. & Admin.News at 4367,

4372 (1990) ("Indian representatives testified that the spirits of *their ancestors* would not rest until they are returned to their homeland . . . ." (emphasis added)); *id.* at 4369 ("For many years, Indian tribes have attempted to have the remains and funerary objects of *their ancestors* returned to them." (emphasis added)). Human remains that are 8340 to 9200 years old and that bear only incidental genetic resemblance to modern-day American Indians, along with incidental genetic resemblance to other peoples, cannot be said to be the Indians' "ancestors" within Congress's meaning. Congress enacted NAGPRA to give American Indians control over the remains of their genetic and cultural forbearers, not over the remains of people bearing no special and significant genetic or cultural relationship to some presently existing indigenous tribe, people, or culture.

The age of Kennewick Man's remains, given the limited studies to date, makes it almost impossible to establish *any* relationship between the remains and presently existing American Indians. At least no significant relationship has yet been shown. We cannot give credence to an interpretation of NAGPRA advanced by the government and the Tribal Claimants that would apply its provisions to remains that have at most a tenuous, unknown, and unproven connection, asserted solely because of the geographical location of the find.

## IV

Finally, we address the Secretary's determination that Kennewick Man's remains are Native American, as defined by NAGPRA. We must set aside the Secretary's decision if it was "arbitrary" or "capricious" because the decision was based on inadequate factual support. *See* 5 U.S.C. § 706(2)(A). We review the

full agency record to determine whether substantial evidence [19] supports the agency's decision that Kennewick Man is "Native American" within NAGPRA's meaning. Here, after reviewing the record, we conclude that the record does not contain substantial evidence that Kennewick Man's remains are Native American within NAGPRA's meaning.[20]

The administrative record contains no evidence—let alone substantial evidence—that Kennewick Man's remains are connected by some special or significant genetic or cultural relationship to any presently existing indigenous tribe, people, or culture. An examination of the record demonstrates the absence of evidence that Kennewick Man and modern tribes share significant genetic or cultural features.[21]

No cognizable link exists between Kennewick Man and modern Columbia Plateau Indians. When Kennewick Man's remains were discovered, local coroners initially believed the remains were those of a European, not a Native American, because of their appearance. Later testing by scientists demonstrated that the cranial measurements and features of Kennewick Man most closely resemble those of Polynesians and southern Asians, and that Kennewick Man's measurements and features differ significantly from those of any modern Indian group living in North America.[22]

Scant or no evidence of cultural similarities between Kennewick Man and modern Indians exists. One of the Secretary's experts, Dr. Kenneth Ames, reported that "the empirical gaps in the record preclude establishing cultural continuities or discontinuities, particularly before about 5000 B.C." Dr. Ames noted that, although there was overwhelming evidence that many aspects of the "Plateau Pattern" were present between 1000 B.C. and A.D. 1, "the empirical record precludes establishing

19. See Wileman Bros. & Elliott, Inc. v. Espy, 58 F.3d 1367, 1374–75 (9th Cir.1995) ("When the arbitrary and capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test.") (internal quotation marks omitted), rev'd on other grounds, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). We consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Secretary's decision. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir.2001).

20. In so holding, we necessarily determine that no reasonable person could conclude on this record that Kennewick Man is "Native American" under NAGPRA. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (holding that under the substantial evidence standard the reviewing court "must decide whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion").

21. As pointed out by amici Texas Historical Commission, under the framework proposed by the government and the Tribal Claimants, as soon as any remains are determined to be pre-Columbian, any study or testing of such remains would have to stop. This blanket prohibition could result in improper disposition of remains to parties wholly unrelated to the remains.

22. In a letter announcing his final decision that Kennewick Man is Native American, the Secretary acknowledged this discontinuity:

[T]hat the morphological characteristics of the remains differ from modern day Indian tribes may indicate a cultural discontinuity between the two groups, or may indicate that the cultural group associated with the Kennewick Man may have subsequently intermixed with other groups migrating into or through the region, leading to changes in the morphological characteristics of the group.

cultural continuities or discontinuities across increasingly remote periods." He noted that the available evidence is insufficient either to prove or disprove cultural or group continuity dating back earlier than 5000 B.C., which is the case with regard to the Kennewick Man's remains, and that there is evidence that substantial changes occurred in settlement, housing, diet, trade, subsistence patterns, technology, projectile point styles, raw materials, and mortuary rituals at various times between the estimated date when Kennewick Man lived and the beginning of the "Plateau Culture" some 2000 to 3000 years ago.

Dr. Ames' conclusions about the impossibility of establishing cultural continuity between Kennewick Man and modern Indians is confirmed by other evidence that the Secretary credited. For example, the Secretary acknowledges that the record shows that there were no villages or permanent settlements in the Columbia Plateau region 9000 years ago and that human populations then were small and nomadic, traveling long distances in search of food and raw materials. The Secretary's experts determined, and the Secretary acknowledged, that it was not until 2000 to 3000 years ago that populations began to settle into the villages and bands that may have been the antecedents of modern Indian tribes something like those encountered by European settlers and colonists. As the Secretary summarized, "[c]ultural discontinuities are suggested by evidence that the cultural group existing 8500–9500 years ago was likely small in size and highly mobile while the Plateau culture consisted o[f] larger, more sedentary groups."

The Secretary also acknowledges that "there is very little evidence of burial patterns during the 9500–8500 period and sig-nificant temporal gaps exist in the mortuary record for other periods." So, even if we assume that Kennewick Man was part of a stable social group living in the area, it still would be impossible to say whether his group's burial practices were related to modern tribes' burial practices. The Secretary also noted that "the linguistic analysis was unable to provide reliable evidence for the 8500–9500 period."

The Secretary's only evidence, perhaps, of a possible cultural relationship between Kennewick Man and modern-day American Indians comes in the form of oral histories. One of the Secretary's experts, Dr. Daniel Boxberger, concluded that modern day Plateau tribes' oral histories—some of which can be interpreted to refer to ancient floods, volcanic eruptions, and the like—are "highly suggestive of long-term establishment of the present-day tribes." Stated another way, Dr. Boxberger noted that oral traditions showed no necessary tale of a superseding migration with newer peoples displacing older ones. But evidence in the record demonstrates that oral histories change relatively quickly, that oral histories may be based on later observation of geological features and deduction (rather than on the first teller's witnessing ancient events), and that these oral histories might be from a culture or group other than the one to which Kennewick Man belonged. The oral traditions relied upon by the Secretary's expert, Dr. Boxberger, entail some published accounts of Native American folk narratives from the Columbia Plateau region, and statements from individual tribal members. But we conclude that these accounts are just not specific enough or reliable enough or relevant enough to show a significant relationship of the Tribal Claimants with Kennewick Man. Because oral accounts have been inevitably changed in context of

transmission, because the traditions include myths that cannot be considered as if factual histories, because the value of such accounts is limited by concerns of authenticity, reliability, and accuracy, and because the record as a whole does not show where historical fact ends and mythic tale begins, we do not think that the oral traditions of interest to Dr. Boxberger were adequate to show the required significant relationship of the Kennewick Man's remains to the Tribal Claimants.[23] As the district court observed, 8340 to 9200 years between the life of Kennewick Man and the present is too long a time to bridge merely with evidence of oral traditions.

Considered as a whole, the administrative record might permit the Secretary to conclude reasonably that the Tribal Claimants' ancestors have lived in the region for a very long time. However, because Kennewick Man's remains are *so* old and the information about his era is *so* limited, the record does not permit the Secretary to conclude reasonably that Kennewick Man shares special and significant genetic or cultural features with presently existing indigenous tribes, people, or cultures. We thus hold that Kennewick Man's remains are not Native American human remains within the meaning of NAGPRA and that NAGPRA does not apply to them. Studies of the Kennewick Man's remains by Plaintiffs-scientists may proceed pursuant to ARPA.[24]

We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED.**

23. We find of considerable help the explanations of the uses and limits on oral narratives as explained and documented with scholarly authority by *amicus curiae* Dr. Andrei Simic, Professor of Anthropology at the University of Southern California, in Los Angeles since 1971 who has specialized in study of the role of folklore and oral tradition in developing cultural identity of ethnic groups, and Dr. Harry Glynn Custred, Jr., Professor of Anthropology at California State University in Hayward since 1971, who teaches anthropology, linguistics, and folklore and who has written on the subject of oral traditions.

24. As pointed out by *amici* Texas Historical Commission, Plaintiffs-scientists plan to engage in the following general types of testing: (1) morphometric cranial and post-cranial measurements comparing the Kennewick Man's remains with other populations; (2) dental characteristic studies; (3) DNA studies; and (4) diet analysis.